Brent DALRYMPLE and Diane Marie
Dalrymple, Appellants,

v.

The UNIVERSITY OF TEXAS SYSTEM,
and F.J. Brewerton, Jerry Prock, and
Gilberto de los Santos, in their official
and individual capacities, Appellees.

No. 03–96–00403–CV.

Court of Appeals of Texas,
Austin.

June 26, 1997.

Rehearing Overruled Aug. 28, 1997.

Mark W. Robinett, Brim, Arnett & Judge, P.C., Austin, for Appellants.

Dan Morales, Attorney General, G. Stewart Whitehead, Assistant Attorney General, Austin, for Appellees.

Before CARROLL, C.J., and ABOUSSIE and B.A. SMITH, JJ.

## OPINION

CARROLL, Chief Justice.

Appellants Dr. Brent Dalrymple and his wife sued the University of Texas System and several University administrators in both their individual and official capacities in response to the University's decision to discontinue Dalrymple's status as a candidate for tenure. The trial court granted partial summary judgment in favor of the administrators with respect to the claims against them in their individual capacities. After the remaining causes of action were tried to a jury and final judgment was entered, the Dalrymples brought this appeal of the trial court's summary-judgment decision. We will affirm in part and reverse and remand in part the trial court's order.

## BACKGROUND

Dalrymple began working for the University of Texas–Pan American, School of Business, in 1989. According to the terms of his employment, the University was to allow Dalrymple up to six years to prove his qualification for tenure. However, according to University policy, generally candidates for tenure were not *entitled* to the entire six-year period. Candidates were instead subject to annual tenure evaluations at which they were expected to demonstrate their continued progress toward satisfying the qualifications for tenure. The qualifications for tenure fell into three general categories: classroom teaching abilities, professional achievement (including publication in peer-reviewed journals), and professional service.

The dispute in this case centers around several negative evaluations Dalrymple received from appellees Dr. Prock, Dr. Brewerton, and Dr. de los Santos. Consequently, it is necessary to detail the evaluation process, the substance of Dalrymple's annual tenure evaluations, and other events that transpired during Dalrymple's employment with the University.

According to University policy, Dalrymple's annual tenure evaluations were conducted by several tiers of the University administration. Each evaluation was initially conducted by a committee of peer professors in Dalrymple's department. The committee's recommendation was then forwarded to the chair of the department, Dr. Prock. After Prock formulated his recommendation, a committee of the School of Business made a recommendation. Then, Dr. Brewerton, the dean of the School of Business, reviewed the recommendations and issued his own recommendation. Any negative evaluation by the dean was apparently subject to review by the Vice President of Academic Affairs, and then by the President of the University. A professor dissatisfied with a negative decision apparently had the additional remedies of (1) asking the Vice President of Academic Affairs to convene the University Tenure Committee to review the decision and (2) challenging the negative decision before a University "tribunal."

The record does not contain information regarding Dalrymple's tenure evaluation for 1989. However, the record does reference his annual "faculty evaluation," which is not the same as a tenure evaluation. According to that document, Prock gave Dalrymple a score of 7 on a scale of 1 to 10 in the category of professional achievement in 1989.

In the fall of 1990, Dalrymple received favorable evaluations from all levels of the administration. He was continued on the tenure track, but both the department committee and the department chair recommended Dalrymple strive to publish more in peer-reviewed journals. One of the committee evaluators was appellee Dr. de los Santos. Prock gave Dalrymple a score of 4 in the category of professional achievement in 1990.

Also in the fall of 1990, Dalrymple served on a University committee in charge of conducting evaluations of peer professors for purposes of determining eligibility for merit raises. During his service on this committee, Dalrymple had occasion to consider the eligibility of de los Santos for a merit raise. For reasons not pertinent to this dispute, Dalrymple and the rest of the committee declined to recommend de los Santos for a merit raise. The committee made this negative recommendation contrary to the urging of Brewerton, who suggested de los Santos was eligible for a merit raise.

In 1991, de los Santos was again a member of the peer committee charged with evaluating Dalrymple. Contrary to the recommendations of the other two members of the committee, de los Santos recommended Dalrymple not be continued on tenure track. De los Santos based his negative evaluation on Dalrymple's lack of professional achievement during his probationary period and his "less than satisfactory work" on the merit raise committee. Despite the majority of the department committee's recommendation that Dalrymple's probationary status be continued, Prock and Brewerton agreed with de los Santos. Their evaluations stated the basis for their decisions was Dalrymple's lack of progress in the professional achievement category. Nevertheless, the Vice President of Academic Affairs reversed the negative

recommendation and renewed Dalrymple's probationary status for one more year, in order to give Dalrymple a chance to demonstrate his ability to publish.

Additionally in the fall of 1991, Dalrymple disclosed the content of his previous evaluations to some of his colleagues. In response, Prock and Brewerton ordered Dalrymple and all faculty members not to disclose any information in their personal evaluation files. Dalrymple and the administrators engaged in a heated exchange of memoranda about the legality of the "gag order," and Dalrymple went so far as to report the order to the district attorney and a legislator. Top officials at the University eventually settled the matter by declaring that faculty members could in fact discuss the contents of their own files with colleagues.

In 1992, two department committee members (including de los Santos), Prock and Brewerton, and the Vice President of Academic Affairs gave Dalrymple negative evaluations. The stated basis of all negative evaluations was Dalrymple's failure to publish at the expected rate. Dalrymple challenged the negative recommendations before the University Tenure Committee, which recommended he be allowed to continue on tenure track. The committee cited internal problems within the School of Business as a possible reason for Dalrymple's failure to publish. Despite the committee's comments, the President of the University did not adopt the committee's recommendation.

Pursuant to the President's decision to terminate Dalrymple's probationary status, Dalrymple's employment was terminated as of August 1994. He challenged the decision before a University "tribunal," which held a hearing to determine whether the University had terminated him for illegal reasons. The tribunal determined in early 1994 that Dalrymple's termination was supported by his lack of professional achievement.

Dalrymple sued the University, de los Santos, Prock, and Brewerton. The most recent amended pleading alleges the following causes of action: violation of Dalrymple's constitutional rights; intentional infliction of emotional distress; tortious interference with Dalrymple's business relationships; and violations of the Whistleblower Act. *See* Tex. Gov't Code Ann. §§ 554.002–.010 (West 1990 & Supp.1997). Dalrymple sought an injunction, exemplary damages, damages for lost wages and benefits, loss of future earning capacity, physical pain, mental anguish, attorneys' fees, and costs of court. His wife sought damages for physical pain, mental anguish, and loss of consortium damages in conjunction with the intentional infliction of emotional distress claims.

The individual administrators sought summary judgment on several grounds, alleging: (1) the doctrine of tortious interference with business relationships did not apply because the administrators were not third parties to the contract; (2) their actions were not extreme and outrageous as a matter of law; (3) Mrs. Dalrymple had no right to recover independent of Dalrymple; (4) Texas does not recognize a cause of action for damages under the constitution;[1] and (5) they were entitled to official immunity. The trial court granted summary judgment in favor of the administrators in their individual capacities but did not state the basis of the judgment in the order. The remainder of the claims were tried to a jury.

The Dalrymples now appeal the trial court's partial summary judgment in four points of error. They do not contest the trial court's ruling on their claim for damages under the constitution. They do, however, challenge the other four grounds the administrators asserted in their summary-judgment motion.

### STANDARD OF REVIEW

The standards for review of a summary judgment are well settled: (1) the movant must show there is no genuine issue of material fact and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue pre-

---

1. The administrators' argument was directed solely at the Dalrymples' claim for damages under the constitution; it was not directed at the Dalrymples' claim for equitable remedies under the constitution. *See generally O'Bryant v. City of Midland,* 949 S.W.2d 406, 413–415 (Tex.App.— Austin 1997, no writ h.).

cluding summary judgment, the court must take evidence favorable to the nonmovant as true; and (3) the court must indulge every reasonable inference in favor of the nonmovant and resolve any doubts in the nonmovant's favor. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

■ A defendant seeking summary judgment based on a plaintiff's inability to prove its case must conclusively disprove at least one element of each of the plaintiff's causes of action. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991). Only when the defendant disproves one of the essential elements of a cause of action does the plaintiff carry the burden of producing controverting evidence and raising a fact issue as to the negated element. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979). Conversely, a defendant seeking summary judgment based on an affirmative defense has the burden of proving conclusively every element of the defense. *See, e.g., Kassen v. Hatley*, 887 S.W.2d 4, 8 (Tex.1994). A defendant is not entitled to judgment as a matter of law on an affirmative defense if the plaintiff raises a material fact issue relevant to any element of the defense. *See id.* at 9.

■ Because the propriety of a summary judgment is a question of law, we review the trial court's decision *de novo*. *See Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex. 1994). When a trial court does not state the basis for its decision in its summary-judgment order, we must uphold the order if any of the theories advanced in the motion are meritorious. *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex.1989). Conversely, we must reverse the order if we find no valid legal basis in the motion. Because the trial court did not state the basis for its ruling, we will assume for purposes of this opinion that the court agreed with each of the administrators' contentions in their motion. Accordingly, we will address each of the challenged arguments in turn.

## DISCUSSION

### Official Immunity

■ We first address point of error one in which the Dalrymples contend the administrators were not entitled to official immunity from their claims. Government employees are entitled to immunity from suit arising from (1) the performance of their discretionary duties (2) in good faith (3) so long as they are acting within the scope of their authority. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994). Official immunity is an affirmative defense. *Id.* Thus, we must determine whether the administrators conclusively established each element of the defense and, if so, whether the Dalrymples produced proof creating a material fact issue as to any element of the defense.

■ The Dalrymples argue on appeal that the administrators' negative evaluations were retaliatory in nature. The administrators respond that their actions were motivated by their desire to follow University policy and ensure that tenured professors had made sufficient professional achievements. The controversy centers, therefore, on the second element of official immunity.[2]

■■ The Texas "good faith" standard is derived from the federal standard, a test of objective legal reasonableness. *Id.* at 656. A summary-judgment movant can satisfy the good faith requirement of official immunity by showing a reasonably prudent official, under the same or similar circumstances, could have believed that the action complained of was warranted. *Id.* at 656–57. This element of the test is designed to ensure that officials who act in good faith, even negligently, are protected. *See id.* at 655, 656 n. 5.

■ Our review of the summary-judgment proof reveals that the administrators initially proved they acted in good faith. The sum-

---

**2.** Even if the Dalrymples challenged the court's determination of the other two elements of the defense, we would agree with the trial court's judgment on those issues. The administrators established that University policy required them to compile annual tenure evaluations. That duty is discretionary because it involves personal deliberation, decision, and judgment. *Cf. Chambers*, 883 S.W.2d at 654. The Dalrymples did not produce any proof controverting those assertions.

mary-judgment record shows Dalrymple never did publish in peer-reviewed journals during his term at the University, despite the fact that he had a total of four years to do so. The administrators attached to their summary-judgment motion copies of Prock's and Brewerton's 1992 evaluations of Dalrymple. The stated reason for the negative recommendations in those evaluations was Dalrymple's failure to publish the number and type of articles expected of a candidate for tenure after three years of work. Furthermore, appended to the motion was a copy of the tribunal's report, which contained a summary of events leading up to Dalrymple's termination. The summary shows de los Santos was on Dalrymple's evaluation committee as early as 1990, before the 1991 merit raise dispute. According to the summary, de los Santos first noted Dalrymple's lack of progress in publishing in 1990. He first gave Dalrymple a negative recommendation in 1991, and emphasized Dalrymple still lacked progress in publishing. The summary-judgment record shows several other evaluators gave Dalrymple negative recommendations based on his failure to publish. Finally, the administrators' proof shows that during the time period in question, the University was seeking to gain the approval of accreditation institutions by improving the quality of its tenured faculty. These facts support the administrators' argument that a reasonable official could have thought the negative treatment of Dalrymple was warranted by his failure to publish and the University's legitimate desire not to extend tenure to unqualified candidates. The administrators established the existence of a legitimate reason for their actions, and they produced some evidence that they based their actions on that reason.

■ Because the movants supplied proof of their official immunity defense, we must look to the Dalrymples' response and determine if it raised a material fact issue as to the administrators' good faith. *See Clear Creek Basin Auth.*, 589 S.W.2d at 678. The supreme court recently adopted a new formulation of the nonmovant's burden on this issue. That is, in order to controvert a movant's prima facie case on this issue, a nonmovant must show "no reasonable person in

the defendant's position could have thought the facts were such that they justified the defendant's acts." *Chambers*, 883 S.W.2d at 657. This formulation of the test primarily requires a court to decide whether an official's actions were objectively, rather than subjectively, reasonable. *Id.* at 656. At first blush, the nonmovant's task appears onerous because often even an intentional, ill-motivated action may be explained by some plausible, yet hypothetical, rationale. We recognize that the supreme court changed the character of the "good faith" test in *Chambers*. However, we do not believe the supreme court's opinion in that case indicates the court intended to eliminate completely the subjective element and consequently transform the "good faith" test into a "good pretext" test.

The court in *Chambers* was charged with deciding whether a police officer in good faith believed his pursuit of a suspect at high speeds was warranted under the circumstances. The parties in that case did not dispute whether the officer's stated reason for pursuing the suspect was *genuine*. They agreed about the officer's reason and argued about whether it was *reasonable* or *justified*. When read in that context, the supreme court's formulation of the good faith test makes sense.

The test as stated in *Chambers* is difficult to apply literally to cases like this one, in which the parties dispute not just whether the officials' actions were reasonable, but whether the stated reasons for the officials' actions were genuine. The Dalrymples characterize the distinction between this case and cases like *Chambers* as that between an intentional tort and a tort of negligence. We agree. The officer in *Chambers* was accused of *negligent* wrongdoing; the administrators in this case are accused of *intentional* wrongdoing. The supreme court recognized this distinction in its opinion when it noted that the plaintiff's claims sounded in negligence. *See id.* at 655, 656 n. 5. It then stated an objective test for analyzing negligent conduct. Most importantly, the court noted that the federal test, which is the basis of the new test adopted in *Chambers*, does not protect "the plainly incompetent or those

who knowingly violate the law." *See id.* at 656 (citations omitted). Therefore, we do not interpret the court's *Chambers* opinion as eliminating the subjective component of the good faith analysis insofar as it is necessary to determine whether the official was plainly incompetent or willfully violated the law. Based on this interpretation, we conclude that although the nonmovant must satisfy an elevated standard of proof, *id.* at 656, the burden is not impossible to meet in cases like this one.

■ Our interpretation of the supreme court's good faith test also takes into account the well established summary-judgment standards. The court in *Chambers* did not abrogate the long settled standards of review for summary-judgment cases; that is, summary-judgment proof is to be viewed in the light most favorable to the nonmovant, with all doubts resolved in favor of the nonmovant. *See Nixon*, 690 S.W.2d at 548–49. The synthesis of this principle with the good faith test results in the following standard: a nonmovant seeking to defeat summary judgment on the issue of good faith must show no reasonable person in the official's position could have thought *the nonmovant's version of the facts* justified the action. In other words, in summary-judgment proceedings in which the parties disagree about the reasons underlying an official's action, the court must take the *nonmovant's responsive* allegations as true and evaluate the evidence supporting *those* allegations. We believe this formulation is nothing new and merely tailors the test appropriately to the facts of this case while comporting with the supreme court's decision in *Chambers* as well as established summary-judgment standards.

The administrators argue our application of the good faith test enables a plaintiff to overcome summary judgment on official immunity grounds by merely alleging willful or malicious conduct. We disagree. Mere conclusory statements of belief are not enough to overcome summary judgment. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex.1984). A plaintiff will not overcome summary judgment unless he can produce some evidence that his allegations are true. The issue in this case becomes, then, whether the Dal-

rymples produced some evidence that (1) the administrators acted out of retaliation and (2) no reasonable person in the administrators' position could have thought Dalrymple's criticism and activities on the merit raise committee justified giving him negative evaluations and terminating him.

The Dalrymples' response to the motion for summary judgment indicated the administrators may not have based their evaluations on Dalrymple's record of professional achievement. First, the Dalrymples established that de los Santos did not meet the eligibility requirements for a merit raise in 1990 and Dalrymple declined to recommend de los Santos for a raise for that reason. Furthermore, the record indicates that Prock and Brewerton recommended de los Santos for a merit raise despite his ineligibility. When Dalrymple became aware that de los Santos had actually received a merit raise, he reported the allegedly illegal activity to higher authorities. The record also indicates that Dalrymple was the impetus behind harsh criticism that Prock and Brewerton received regarding their issuance of the "gag order." It is reasonable to infer that Dalrymple had a poor relationship with the administrators as a result of his criticism of them.

The record also suggests evaluations of Dalrymple may have been negative because of his poor relationships with the administrators, rather than his lack of professional achievement. De los Santos's first negative evaluation of Dalrymple was clearly motivated in part by Dalrymple's activities on the merit raise committee; the evaluation specifically noted de los Santos's opinion that Dalrymple's work on the committee was "unsatisfactory." Moreover, the record shows that several other professors received positive evaluations from these administrators despite the other professors' arguably inadequate qualifications for tenure. The report of the University Tenure Committee noted that the negative recommendations concerning Dalrymple's performance coincided with his public criticism of the administrators. It is reasonable to infer that Prock and Brewerton would harbor some animosity toward Dalrymple after he complained to their superiors and the district attorney that they had

violated the law. It is also reasonable to infer that the evaluations by Prock and Brewerton were not based solely on Dalrymple's lack of professional achievement but also on this animosity toward him.

The critical question becomes, therefore, whether Dalrymple established that no reasonable person could have thought his activities warranted negative evaluations and termination. The record reveals that University policy prohibited administrators from basing evaluations on criteria other than classroom teaching ability, professional achievement, and professional service. University policy also mandated preservation of an atmosphere of academic freedom. The record suggests that Dalrymple's actions were within his academic discretion and were irrelevant to the three evaluation criteria. In other words, the record suggests that no reasonable administrator at the University could believe that Dalrymple's actions were a valid basis for negative evaluation or termination. Taking as true (as we must) Dalrymple's evidence that professional underachievement was not the basis for the negative treatment, we hold the summary-judgment record raises a material fact issue as to whether the administrators acted in good faith. Consequently, we hold the trial court's summary judgment was not supportable on official immunity grounds and we sustain the Dalrymples' first point of error.

### Intentional Infliction of Emotional Distress

■■■ In their second point of error, the Dalrymples argue the trial court erred in granting the administrators summary judgment on the intentional infliction of emotional distress claim. To establish liability under that doctrine, the Dalrymples were required to prove (1) the administrators acted intentionally or recklessly, (2) the conduct was "extreme and outrageous," (3) the administrators' actions caused the Dalrymples emotional distress, and (4) the resulting emotional distress was severe. See *Wornick v. Casas,* 856 S.W.2d 732, 734 (Tex. 1993).

In their motion for summary judgment, the administrators argued the Dalrymples'

could not prevail on the claim for three reasons: (1) the cause of action was barred by the statute of limitations; (2) the doctrine is not applicable in the employment context; and (3) the administrators' conduct was not extreme and outrageous as a matter of law.

■■■ The limitations period applicable to this cause of action is two years. See Tex. Civ. Prac. & Rem.Code Ann. § 16.003(a) (West Supp.1997); *Bhalli v. Methodist Hosp.,* 896 S.W.2d 207, 211 (Tex.App.—Houston [1st Dist.] 1995, writ denied); *Patrick v. Howard,* 904 S.W.2d 941, 943 (Tex.App.—Austin 1995, no writ). The statute begins to run when the actions complained of stop, regardless of whether the claim is based upon a single action or a continuous course of conduct. See *Twyman v. Twyman,* 790 S.W.2d 819, 820–21 (Tex.App.—Austin 1990), *rev'd on other grounds,* 855 S.W.2d 619 (Tex. 1993); *see also Bhalli,* 896 S.W.2d at 211. The actions of which the Dalrymples complain did not stop until Dr. Dalrymple was terminated in August 1993. The Dalrymples filed their lawsuit in April 1994, well within the two-year limitations period. We must, therefore, determine whether either of the administrators' other arguments support the trial court's order.

■■■ The administrators cite authorities supporting the proposition that Texas courts are *hesitant* to sustain claims of intentional infliction of emotional distress claims in the employment context. See, e.g., *Amador v. Tan,* 855 S.W.2d 131 (Tex.App.—El Paso 1993, writ denied). However, the administrators provide no authority for the proposition that the doctrine is *inapplicable* to employment disputes. We acknowledge that a "mere employment dispute" does not give rise to a claim for intentional infliction of emotional distress. See, e.g., *Miller v. Galveston/Houston Diocese,* 911 S.W.2d 897, 900–901 (Tex.App.—Amarillo 1995, no writ). Some facts do give rise to the cause, however, even in the employment context. See *Wornick,* 856 S.W.2d at 736. Because the doctrine can apply in employment contexts, the administrators' assertion that the doctrine is strictly inapplicable to employment situations does not support the summary

judgment. The administrators' brief on this issue essentially argues that their actions were not extreme and outrageous enough to support a claim for intentional infliction of emotional distress. We will discuss the merits of their contentions, therefore, with their other argument about the "extreme and outrageous" element of the cause of action.

For summary judgment purposes, extreme and outrageous conduct is that which exceeds all possible bounds of decency, and is regarded as atrocious and utterly intolerable in a civilized community as a matter of law. *Wornick,* 856 S.W.2d at 734. The administrators gave a reasonable explanation for giving Dalrymple negative evaluations and for terminating him. However, as discussed above, Dalrymple produced documents supporting the idea that the administrators took the offensive actions in retaliation for his "whistleblowing" activities.

The administrators contend their actions were akin to conduct previously held not "extreme or outrageous" as a matter of law in *Wornick,* 856 S.W.2d at 732, *DeMoranville v. Specialty Retailers, Inc.,* 909 S.W.2d 90 (Tex.App.—Houston [14th Dist.] 1995), *rev'd on other grounds,* 933 S.W.2d 490 (Tex.1996), *Cote v. Rivera,* 894 S.W.2d 536 (Tex.App.—Austin 1995, no writ), *Beiser v. Tomball Hospital Authority,* 902 S.W.2d 721 (Tex.App.—Houston [1st Dist.] 1995, writ denied), and *Horton v. Montgomery Ward & Co., Inc.,* 827 S.W.2d 361, 369 (Tex.App.—San Antonio 1992, writ denied). The *Cote, DeMoranville,* and *Horton* cases are distinguishable because the discharged employees in those cases complained about the manner in which they were treated, rather than the employers's motivation for the alleged negative treatment. The *Wornick* case is closer. In *Wornick,* the supreme court held that an employee who alleged she was terminated because she knew of her employer's illegal activity had not alleged extreme and outrageous conduct as a matter of law. *Wornick,* 856 S.W.2d at 732. This case is distinguishable from *Wornick* in that Dalrymple did not allege he was terminated for *knowing* about the administrators' improper activities; he alleged he was fired for *disclosing* the im-

proper activities. Furthermore, Dalrymple produced evidence supporting his allegations, which the employee did not do in *Wornick. See id.* at 737 (Hecht, J., concurring), 738 (Doggett, J., concurring). It is reasonable to conclude that retaliating against Dalrymple for actively opposing illegal or improper activities, or for informing authorities of such activities, might have been extreme and outrageous. *See id.* at 738 (Doggett, J., concurring); *cf. O'Bryant,* 949 S.W.2d at 415–416 (summary judgment not proper against police officers who suffered negative employment action after asserting discrimination claims in lawsuit). *But see Beiser,* 902 S.W.2d at 725 (employee who alleged he was fired for reporting illegal activity had not alleged "extreme and outrageous" conduct). We decline to hold, as did the court in *Beiser,* that terminating an employee for opposing and disclosing illegal activity is not utterly intolerable *as a matter of law.* Because we must accept the Dalrymples' summary-judgment proof as true, and because we believe reasonable minds could think Dalrymple's version of the administrators' conduct was extreme and outrageous, we hold Dalrymple alleged and produced proof of sufficient facts to survive summary judgment on the issue of extreme and outrageous conduct. We, therefore, sustain the Dalrymples' second point of error.

In their fourth point of error, the Dalrymples contend the trial court erred in granting summary judgment against Dr. Dalrymple's wife, Diane Dalrymple, based on the theory that she had no independent right to loss of consortium damages in conjunction with the intentional infliction of emotional distress claim. The administrators argued in their motion for summary judgment that Mrs. Dalrymple was not entitled to recover loss of consortium damages because her claim of intentional infliction of emotional distress was not based on any physical injury to Dr. Dalrymple. It is true that damages for loss of consortium are not recoverable absent proof of physical injury to a spouse. *See Browning–Ferris Indus. v. Lieck,* 881 S.W.2d 288, 294–95 (Tex.1994). However, the administrators' argument fails because Dr. Dalrymple averred in his summary-judg-

ment proof that he suffered physical injury and headaches as a result of the administrators' negative actions. We, therefore, sustain the Dalrymples' fourth point of error.

### Tortious Interference with Business Relationships

█ Dalrymple sought to hold the administrators liable for tortious interference with his employment contract with the University. In order to prevail on this cause of action, Dalrymple was required to prove (1) the existence of a business relationship subject to interference, (2) the occurrence of an act of interference that was willful and intentional, (3) that the act was a proximate cause of his injury, and (4) that actual damage or loss occurred. *See Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex.1995). The administrators moved for summary judgment, alleging they could not have been liable as a matter of law because they were agents of the entity with which Dalrymple had a business relationship. They did not argue Dalrymple could not prove the elements of the cause of action.

█ In general, the doctrine of tortious interference applies only to interference committed by a third party, or stranger, to the contract. *Id.* at 795. However, when a defendant is both an agent of a party to the contract and the person accused of tortious interference, a plaintiff may assert the cause of action by additionally proving the defendant acted so contrary to the principal's interests that his actions could only have been motivated by personal interests. *Id.* at 796–98. This additional requirement preserves the logically necessary rule that a party cannot tortiously interfere with its own contract. *Id.* Where reasonable minds can differ on this issue, summary judgment will not stand. *Lassiter v. Wilkenfeld*, 930 S.W.2d 803, 808 (Tex.App.—Beaumont 1996, writ requested).

█ The administrators made a prima facie showing that they acted in the University's best interests. For example, the administrators produced proof that the University was trying to enhance its standing with accreditation entities by improving the quality of its tenured faculty. We must determine, therefore, whether Dalrymple's response raised a material fact issue as to whether the administrators acted in their personal interests and contrary to the University's interest.

We conclude Dalrymple's summary-judgment proof does not raise a material fact issue as to whether the administrators acted in their personal interests and contrary to the University's interests. As detailed above, Dalrymple produced some evidence that indicated the administrators acted in bad faith (i.e., wanted to terminate him because of his "whistleblowing" activities). However, Dalrymple produced no evidence suggesting the administrators would profit personally from his absence. De los Santos received a merit raise despite Dalrymple's activities and his continued presence at the University. Moreover, Dalrymple did not establish that Prock and Brewerton stood to suffer adverse employment actions if Dalrymple remained employed with the University. We hold that the administrators were entitled to judgment as a matter of law on this issue. Accordingly, we overrule Dalrymple's third point of error.

### CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment in favor of the administrators on the tortious interference claim and the claim for damages under the constitution. We reverse the trial court's judgment insofar as it pertains to the claims of intentional infliction of emotional distress and for equitable relief under the constitution. We sever these claims from the rest of the suit and remand them for resolution in proceedings not inconsistent with this opinion.