Wuertz3 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-95-00414-CV







David Wuertz/Sam Wilson, Appellants




v.




Sam Wilson/David Wuertz, Appellees








FROM THE COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY


NO. 215,081, HONORABLE ORLINDA L. NARANJO, JUDGE PRESIDING








 David Wuertz appeals from a judgment of the trial court in which the jury found
that he had invaded Sam Wilson's privacy and awarded Wilson compensatory damages in the
amount of $36,300 as well as $5,000 in punitive damages. The court granted Wuertz a judgment
notwithstanding the verdict with respect to the $5,000 punitive damages award, and Wuertz
appeals the judgment awarding Wilson actual damages. Wilson also appeals, but limits his appeal
to the judgment notwithstanding the verdict. We will reverse and remand for a new trial.



BACKGROUND


 In March 1980, Sam Wilson began working for the City of Austin's Emergency
Medical Services Department ("EMS") where he was employed until his suspension on February
14, 1992. On that date, David Wuertz was the Director of EMS, Robert Gutierrez was Wilson's
Shift Commander, and Michael Morris was the EMS Chief of Operations. In other words,
Gutierrez and Morris were between Wilson and Wuertz in the chain of command, and they are
the ones who originally brought Wilson's alleged problem to Wuertz's attention.

 Gutierrez initially became alarmed when Clancey Terrill, a subordinate of
Wilson's, mentioned that he would not be surprised if, in the near future, EMS had to run a call
to Wilson's home because Wilson had overdosed on drugs. According to Gutierrez, this is when
he began to piece Wilson's work performance problems together with other personal problems he
knew Wilson was facing. For example, Wilson was having marital difficulties, Wilson's daughter
faced unfortunate psychological problems, and Wilson was bankrupt. Gutierrez testified that
everything "fit into a puzzle piece" and indicated to him that Wilson had a serious problem which
needed to be addressed.

 On February 14, 1992, Wilson, who was a paramedic and a District Commander
for EMS, was called into Wuertz's office to meet with Wuertz, Morris, and Gutierrez about his
job performance problems. At the meeting, Wilson was given a suspension memo written by
Gutierrez explaining the reasons behind the suspension. Although he did not write the memo,
Wuertz approved its issuance. Among the job performance problems listed in the memo were
rapid variations in mood, excessive absenteeism, high use of sick leave, excessive tardiness, the
seemingly unsupervised and uninformed nature of Wilson's staff, Wilson himself being an
uninformed supervisor, and an alleged intimate relationship with a female employee. Because of
these problems, the consensus of opinion was that public safety required Wilson's immediate
suspension. The suspension memo provided that Wilson would not be allowed to return to work
until he completed a psychological and physical evaluation administered by physicians paid for
by EMS. The suspension was without pay, although Wilson was allowed to and did use his
accrued sick leave and vacation time for which he was paid.

 After unsuccessfully appealing the requirements of the memo pursuant to the City's
Personnel Policies, Wilson believed that he would be terminated if he did not submit to the
physical and psychological testing. So, upon the advice of counsel, Wilson arranged the testing
with the doctors selected by EMS. Wilson underwent a battery of psychological tests by Dr.
Andy Sekel, which he described as "very invasive, very prying, [and] beyond the scope of what
someone would look for in the face of the allegations in the memo." For example, the questions
addressed such topics as sexual deviancy, abusive situations in the home, and bed-wetting. Next,
Wilson went to see Dr. David Jones, a family practitioner and a specialist in addictionism, and
underwent a complete physical examination. Among other things, Dr. Jones took a blood sample
and a urine sample and administered a prostate exam, a hernia exam, and a fundoscopic (ear)
exam. According to Wilson, "[t]here was a great deal of very personal, very intimate information
that was delivered to Dr. Jones that, frankly, the EMS Department, Michael Morris, in particular,
had no business knowing."

 Wilson's urine tests came back positive for marihuana, and his hair specimen came
back positive for the use of cocaine and marihuana. Wilson disputes only the results indicating
the use of cocaine. Dr. Jones advised Morris that Wilson could return to work under certain
conditions. First, Wilson had to enroll in either an inpatient or outpatient drug program. Second,
Wilson had to voluntarily submit to random urinalysis for the next two years. The record, in fact,
shows that Dr. Troy Anderson, the EMS medical director, modified the conditions by additionally
requiring Wilson to submit to urinalysis every time he began a shift and by forbidding Wilson to
work as a solo practice paramedic. In other words, Wilson could no longer answer emergency
calls in situations where he would be the only paramedic on the scene.

 On or about April 6, 1992, Morris received a letter from Wilson confirming that
Wilson had completed the physical and psychological examinations as required by the suspension
memo. Wilson consented to the imposed conditions and returned to work around April 14, 1992. 
Wilson, however, resigned from EMS on June 2, 1992.

 Wilson filed suit shortly thereafter against the City of Austin, Camille Cates
Barnett, who was Austin's City Manager at the time, and Wuertz. Wilson sought damages for
common law invasion of privacy and quantum meruit as well as a judicial declaration that the
City's requirement that he receive physical and psychological testing before returning to work for
EMS violated the Texas Constitution. The trial court ordered that Wilson take nothing against
the City and Barnett, but the jury awarded Wilson $36,300 in compensatory damages and $5,000
in punitive damages against Wuertz in his individual capacity. The trial court then granted
Wuertz's motion for judgment notwithstanding the verdict and ordered that Wilson take nothing
in punitive damages. Wuertz appeals the $36,300 award of compensatory damages; Wilson
appeals the trial court's granting of Wuertz's motion for judgment notwithstanding the verdict as
to the award of punitive damages.



DISCUSSION


 We first address Wuertz's appeal. In point of error one, Wuertz argues that the
trial court erred in denying him qualified immunity by overruling his motion for judgment
notwithstanding the verdict and motion for new trial because the evidence conclusively established
that Wuertz acted in good faith which required a "yes" answer to jury question number three or,
alternatively, the jury's "no" answer to jury question number three was against the great weight
and preponderance of the evidence. (1)

 In certain situations, a trial court may render judgment notwithstanding the verdict
and substitute its own judgment. State v. Huffstutler, 871 S.W.2d 955, 961 (Tex. App.--Austin
1994, no writ). But a trial court may render judgment notwithstanding the verdict only if a
directed verdict would have been proper under the circumstances of the case. Id. Where the
pleadings and the evidence raise factual issues for the jury's determination, a directed verdict is
not proper. Id. Thus, "[a] judgment notwithstanding the verdict must be based on conclusive
evidence which entitles the moving party to judgment as a matter of law." Id.

 The test for a conclusive evidence point of error resembles the test for a no
evidence point. Both cases involve a search for some evidence. National Farmers Union Prop.
& Casualty Co. v. Degollado, 844 S.W.2d 892, 895 (Tex. App.--Austin 1992, writ denied). 
When faced with an attack on a jury finding alleging that the evidence on a fact question
conclusively established the opposite result from what the jury found, we first consider only the
evidence and inferences tending to support the finding and disregard all evidence and inferences
to the contrary. Id. at 895-96. If the jury finding is supported by some evidence, then the inquiry
stops. Id. at 896. If, however, there is no evidence to support the jury finding, then the entire
record must be examined to see if the contrary proposition is established as a matter of law. 
Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989).

 Thus, in this case, we must consider only the evidence and inferences tending to
support the finding that Wuertz was not entitled to the qualified immunity privilege and disregard
all evidence and inferences to the contrary. Because the presence of the other elements of official
immunity are not disputed, we consider only the evidence and inferences tending to support the
finding that Wuertz was not acting in good faith. (2) As a general rule, EMS employees do not have
to submit to annual physical or psychological testing. Wuertz did not place any parameters upon
the scope of Wilson's testing, thus allowing the doctors to conduct examinations that were
unlimited in their scope. In this case, no questions had ever been raised about Wilson's medical
capabilities before the issuance of the memo, and none of the disciplinary tools found in the City's
Personnel Policies had ever been used against him.

 The evidence indicates that Wuertz knew that some of the charges found in the
memo were not exactly correct, but authorized the issuance of the memo anyway. For example,
some testimony indicated that the figures in the memo regarding Wilson's extensive use of sick
time may have been exaggerated. Further, testimony indicated that, despite the allegations in the
memo, Wilson had never failed to attend a scheduled Department meeting. In fact, Wuertz knew
that Wilson, though late, actually did attend the February 6, 1992 meeting, the only meeting that
the memo specifically lists as being one missed by Wilson. Finally, the memo notes that Wilson
had previously been confronted about an intimate relationship with a female employee, but Wuertz
admits that these charges were never substantiated. Because there is some evidence supporting
the proposition that no reasonably prudent EMS Director could have believed it was appropriate
to require Wilson to undergo physical and psychological testing, we determine that it is not
conclusively established that Wuertz acted in good faith and that the trial court did not err in
overruling Wuertz's motion for judgment notwithstanding the verdict as well as his motion for
new trial.

 Alternatively, in point of error one, Wuertz argues that the jury's "no" answer to
jury question number three was against the great weight and preponderance of the evidence. We
agree. When considering a "great weight" point of error, we must review the entire record. Lake
LBJ Mun. Util. Dist. v. Coulson, 839 S.W.2d 880, 884 (Tex. App.--Austin 1992, no writ) (citing
Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986)). In doing so we consider and weigh all the
evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust. Id. When reversing a judgment on a factual
sufficiency point, we must detail the evidence relevant to the issue in question and clearly set forth
why the finding is factually insufficient. Town of Sunnyvale v. Mayhew, 905 S.W.2d 234, 244
(Tex. App.--Dallas 1994, writ requested) (citing Pool v. Ford Motor Co., 715 S.W.2d 629, 635
(Tex. 1986)).

 At trial, Wuertz stated:



[A]s a public safety director, I held the same rank as a police chief or a fire chief. 
So the first responsibility of the public safety and department head is to insure
public safety, to make sure the [Emergency Medical Technicians] and the
paramedics, who are on the street and staff the ambulances, have the very best
ability and best training. 



As a prudent manager burdened with the responsibility of supervising and controlling the entire
EMS Department, Wuertz testified that he never took employment decisions lightly. Although
Wuertz did not know what was causing Wilson's specific problem, he did know that there were
many things going on in Wilson's personal life that could be contributing to this erratic work
performance. For example, Wuertz knew of Wilson's marital and financial difficulties as well
as his daughter's psychological problems.

 Wuertz knew that Wilson's erratic behavior could potentially lead to trouble in the
near future. A paramedic's momentary lapse of attention or inability to recall essential
information could have a catastrophic effect on the public. According to Wuertz, "It could be
the difference between life and death of a patient. We carry a number of medications that, if
given in the wrong dosage or the wrong route, could kill somebody, or certainly worsen their
condition."

 Because the EMS Department is composed of nearly 200 people spread over a
thousand square miles, it is difficult for Wuertz to keep up with every employee. Accordingly,
EMS utilizes a platoon structure in which district and shift commanders are responsible for those
beneath them in the chain of command. Gutierrez and Morris were between Wuertz and Wilson
in the chain of command, and Wuertz properly relied upon them to verify the contents of Wilson's
suspension memo. Further, Wuertz reviewed EMS time records and consulted with the City Law
Department about Wilson's problems before he gave Wilson the memo.

 At the time the memo was issued, Wuertz had 19 years of experience with EMS,
including 3 years as EMS Director. Gutierrez also had 19 years of experience with EMS as of
the time of trial, holding such positions as Senior Paramedic, District Commander and Shift
Commander. Morris, one of the original EMS employees who joined the Department at the time
of its formation in 1975, was EMS Chief of Operations at the time the memo was issued and had
experience as both a District and Shift Commander. In light of the EMS mission to deliver the
very best care that it possibly can to sick people in Austin and Travis County and in light of their
considerable work experience, Wuertz, Morris, and Gutierrez believed that Wilson should be
required to submit to physical and psychological testing in order to retain his job. Because Wilson
was an at-will employee, Wuertz could have fired Wilson for any reason or for no reason. See
Federal Express Corp. v. Dutschmann, 846 S.W.2d 282, 283 (Tex. 1993). Instead, Wuertz chose
to give Wilson a chance to identify his problem and to come back to work. Gutierrez testified that
this was a situation where he was trying to help a friend, while maintaining his responsibilities
to the Department. Gutierrez stated that he "just didn't want it to reach the point where
[Wilson's] medical performance would suffer or his decision making in the field would suffer."

 Wuertz, with his many years of experience and in consultation with the equally-experienced Gutierrez and Morris, required Wilson to undergo certain physical and psychological
tests before returning to his job. Because of the serious nature of Wuertz's job responsibilities
and the possible consequences to public safety of allowing an EMS supervisor burdened as Wilson
was with personal problems to continue serving the public in an emergency medical capacity, we
believe that the jury's "no" answer to jury question three was against the great weight and
preponderance of the evidence.

 We conclude that it was clearly wrong and unjust for the jury to find that no
reasonable government official, under the same or similar circumstances faced by Wuertz, could
have believed his or her acts were justified. After conferring with Gutierrez and Morris and
observing for himself, Wuertz decided to authorize the memo. The great weight of the evidence
indicates that he was motivated by his responsibilities to public safety and that he acted in the
good faith performance of his duties within the scope of his employment. There is nothing in the
record to suggest that Wuertz approached his decision with any type of personal malice or animus
involving Wilson. Accordingly, we sustain the portion of Wuertz's point of error one challenging
the factual sufficiency of the jury's "no" answer to question number three.



CONCLUSION


 Because we sustain the factual sufficiency portion of Wuertz's point of error one,
we do not address Wuertz's remaining points, nor do we address Wilson's limited appeal. 
Accordingly, we reverse the judgment and remand the cause for a new trial.



 

 Jimmy Carroll, Chief Justice

Before Chief Justice Carroll, Justices Jones and B. A. Smith

Reversed and Remanded

Filed: April 24, 1996

Publish

 
1.   Question number three of the jury charge asked:


Do you find that the acts, if any, of Defendant Wuertz were privileged?


 Mr. Wuertz is entitled to qualified immunity privilege if a reasonably
prudent director for Emergency Medical Services, under the same of similar
circumstances, could have believed that it was appropriate to require Plaintiff
to have a psychological and physical evaluation by a qualified psychologist
and physician in order to continue to work as a District Commander for
Emergency Medical Services.


Answer "Yes" or "No".
2.   Official immunity is an affirmative defense which government employees are entitled to
raise when they are sued in conjunction with the performance of their (1) discretionary duties
in (2) good faith as long as they are (3) acting within the scope of their authority. City of
Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994). In this case, it is undisputed that
Wuertz was a government employee being sued for the performance of his discretionary duties
while acting within the scope of his authority. Thus, the only element in dispute was whether
Wuertz performed his duty in good faith, and jury question number three properly sets forth
the test for determining good faith. See id. at 656; Gallia v. Schreiber, 907 S.W.2d 864, 868
(Tex. App.--Houston [1st Dist.] 1995, no writ h.).