**CHAMPION BUILDERS and Primero Projects, L.L.C, Appellants,**

v.

**CITY OF TERRELL HILLS, City of Terrell Hills Board of Adjustment, Richard Schimpff, Jon R. Sandige, Anne Ballantyne, Susie Willerson, and Asher McComb, Appellees.**

No. 04–99–00779–CV.

Court of Appeals of Texas, San Antonio.

Dec. 12, 2001.

Dissenting Opinion on Denial of Reconsideration En Banc
Feb. 6, 2002.

Curtis L. Cukjati, E. Conry Davidson, Cacheaux, Cavazos, Newton, Martin & Cukjati, L.L.P., Royal B. Lea, III, Bingham, & Lea, P.C., San Antonio, James M. Hill, Jr., Nunley, Davis, Jolley, Hill & Brant, Boerne, for Appellant.

Hector X. Saenz, Charles S. Frigerio, Law Offices of Charles S. Frigerio, San Antonio, for Appellee.

Sitting en banc: PHIL HARDBERGER, Chief Justice, TOM RICKHOFF, Justice, ALMA L. LÓPEZ, Justice, CATHERINE STONE, Justice, PAUL W. GREEN, Justice, dissenting without opinion SARAH B. DUNCAN, Justice, dissenting without opinion KAREN ANGELINI, Justice, dissenting without opinion.

## OPINION ON APPELLANTS' MOTION FOR REHEARING EN BANC

CATHERINE STONE, Justice.

Appellants Champion Builder, Inc. and Primero Projects, L.L.C. (collectively referred to as "Champion") have filed a motion for rehearing. We conclude there is merit in the motion. Therefore, we withdraw our opinion and judgment of February 7, 2001, and issue this in its place.

The dispute arises out of the revocation of a building permit issued to Champion for the construction of a six-unit apartment complex in Terrell Hills. Champion sued the City of Terrell Hills, its Board of Adjustment (collectively referred to as "the City"), and several members of the Board of Adjustment ("Board members") in their individual capacities for the losses it sustained due to the revocation of its building permit. Specifically, Champion asserted regulatory takings claims against the City and claims of negligence, gross negligence, and tortious interference with contract against the Board members. A jury found in favor of Champion, but a take-nothing judgment was entered in favor of the City and the Board members after the trial court granted motions for judgment n.o.v. filed by the City and the Board members. We affirm the trial court's judgment in regard to the City. We reverse the judgment n.o.v. as to the Board members, and remand the cause for entry of judgment in accordance with the jury's verdict.

### FACTUAL AND PROCEDURAL BACKGROUND

In August 1993, James Spears, owner of Champion, Roldan Treviño, owner of land located on Eventide Drive in Terrell Hills, and Armando Tamez, Jr., formed Primero Projects L.L.C., a joint venture partnership, for the purpose of building an apartment complex on Treviño's Eventide lot.

Treviño and Tamez were the money men behind the venture; Champion and Primero agreed that in return for building and managing the apartment building, Champion would receive one-third interest in Primero.

The parties initially planned to build an eight-unit apartment building on the property. In December 1993, Primero purchased the lot from Treviño for $75,000. Prior to the purchase, Spears researched the project, discussing the plans, code compliance, and building specifications with several key people, including the city manager, the city engineer, and the city fire marshal. These individuals tacitly approved the project. In January 1994, Champion applied for, but was denied, a building permit for the project due to a density problem.[1] Deciding he "did not want a fight with the city," Spears chose not to pursue a zoning variance. He withdrew a request for a zoning variance several days before the matter was to be considered, despite being advised by the city manager that a variance request was the only method by which to remove the lot's split zoning designation. Instead, Champion scaled-down the project to a six-unit complex.

In May 1994, the Board issued Champion a building permit for the construction of a six-unit complex on Eventide. Within days of that action, a disgruntled group of Terrell Hills residents filed an appeal to the Board, contesting the issuance of the permit. Ostensibly, the controversy concerned a frontage problem. Terrell Hills City Ordinance 634 requires each lot to have 80 feet of frontage. The residents contended that the ordinance required 80 feet of semi-commercially zoned frontage

on the subject property as a condition of semi-commercial use.

On June 7, 1994, the Board convened in a public meeting to discuss, among other agenda items, the building permit for the Eventide project. After hearing from both Champion and the residents, the Board members went into a closed executive session wherein they generally discussed their collective desire to revoke the permit because such a project would bring undesirables into the neighborhood. Among other objectionable comments, one Board member referred to a former Terrell Hills apartment complex as a "whorehouse" and another Board member referred to potential renters as "scum" and "drug dealers." Before and during this meeting, Charles Biery, the city attorney for Terrell Hills, indicated that in his opinion the project was in compliance with Ordinance No. 634 and thus the permit should remain in force. Despite Biery's counsel, the Board voted to revoke Champion's permit.

Champion successfully appealed the Board's decision to the district court. A group of Terrell Hills residents intervened in that suit; the City was not involved in the ensuing litigation. In August 1994, the trial court rendered summary judgment in favor of Champion and ordered reissuance of the six-unit building permit. This court affirmed that judgment in November 1995, and the Texas Supreme Court denied review of this court's decision.

Champion never asked the City or the Board to reissue the permit after the district court rendered its decision. While there is no evidence to suggest that the subsequent appeals to either this court or the supreme court created a legal impedi-

---

1. The lot is split-zoned; it is zoned part residential and part semi-commercial. To be in compliance with the zoning regulations, the complex had to fit entirely within the semi-

commercial zoned quadrant of the lot. Spears was aware of the lot's split-zoned classification at the time of purchase.

ment to Champion's ability or right to obtain its permit, Spears testified that the resulting "cloud of litigation" over the project essentially rendered the permit useless because "he could not secure financing." By 1995, the "wheels on Champion's project were coming off." Spears testified that the project was floundering, he had not secured financing, and his partners were becoming disenchanted due to the delays caused by the legal dispute. That same year, unbeknownst to Champion, the City gave the owners of split-zoned lots the opportunity to choose for their lots one uniform zoning category, thus removing for each owner the problems associated with split zoning. Champion was not given notice of this election. In January 1996, the City also passed Ordinance 929, which increased the minimum square footage requirement for single family apartment units from 800 square feet to 1200 square feet. Champion's plans called for 900 square feet per unit.

In June 1996, Champion filed suit against the City, the Board of Adjustment, and certain individual Board members for the conduct surrounding the 1994 permit revocation and the 1995 ordinance changes. With respect to the Board members, Champion alleged that each individual was negligent for: (1) holding an illegal meeting; (2) revoking a permit to which Champion was entitled; and (3) failing to follow the advice and counsel of the city attorney not to revoke the permit. Champion further alleged that such acts and/or omissions were a proximate cause of damage to it.

Champion asserted three takings claims against the City and the Board. First, Champion alleged that the revocation of its permit constituted a taking because such action delayed and ultimately prevented construction of the project, thereby denying Champion the use and benefit of the property. Second, Champion claimed that the application of Ordinance 929, which increased the minimum square footage requirement for single family apartment units from 800 square feet to 1200 square feet, constituted a taking because it destroyed the viability of the project. Third, Champion alleged a procedural due process takings claim in the City's failure to give Primero notice and the opportunity to remove its split zoning designation. Under this third theory of liability, Champion claimed harm in the lost opportunity to reclassify its property as semi-commercial, which would have allowed it to return to its initial eight-unit plan, thereby making the project more profitable.

At trial, the Board members argued that they were shielded from liability due to official immunity. When the case was submitted to the jury, it was charged with determining whether the Board members were negligent and grossly negligent in revoking Champion's permit and whether, notwithstanding such conduct, the members were immune from liability. The sole takings question submitted to the jury asked it to determine whether the City or the Board committed a taking. A "taking" was defined to include regulations that compelled the owner to suffer a physical invasion or regulations that materially and substantially denied the economically beneficial or productive use of the land. The jury was further instructed that a material and substantial deprivation of the beneficial use of the land may amount to a taking. Champion did not submit a question to the jury regarding its procedural due process takings claim arising from the City's failure to give it notice of the opportunity to remove the split zoning designation.

The jury found in favor of Champion on all submitted claims and rejected the Board members' defense of immunity.

Both sides moved for entry of judgment. The City and the Board filed a joint motion for judgment n.o.v., asserting their entitlement to judgment on numerous grounds. The trial court granted the motions for judgment n.o.v., and entered a take-nothing judgment against Champion. The trial court specifically ruled in favor of the Board members on their immunity argument. With respect to the City, the trial court found no evidence of a compensable taking and "insufficient" evidence of damages.

### STANDARD OF REVIEW

A judgment n.o.v. is properly entered only when a directed verdict would have been proper. TEX.R. CIV. P. 301; *Eubanks v. Winn*, 420 S.W.2d 698, 701 (Tex.1967). When there is no evidence upon which a jury could base its findings, the trial court must direct a verdict. *ITT Consumer Fin. Corp. v. Tovar*, 932 S.W.2d 147, 160 (Tex.App.—El Paso 1996, writ denied). When reviewing a no evidence point, we review only the evidence tending to support the jury's verdict and disregard all evidence to the contrary. *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988). If more than a scintilla of evidence supports the jury finding, it must be upheld. *Garcia v. Insurance Co. of Pa.*, 751 S.W.2d 857, 858 (Tex.1988). In other words, if any evidence of probative force supports a contested issue, the judgment n.o.v. was improperly granted. *See Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996).

### OFFICIAL IMMUNITY

A governmental official may be personally liable for his actions that are taken under color of law in violation of the plaintiff's rights. *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). A plaintiff is entitled to recover for damages under a negligence theory provided he establishes bad faith and the four traditional negligence elements: (1) duty; (2) breach of that duty; (3) proximate cause; and (4) actual damages. *Colvin v. Red Steel Co.*, 682 S.W.2d 243, 245 (Tex.1984). As noted, the jury found that the Board members acted in bad faith and were negligent and grossly negligent in their actions surrounding the revocation of the permit. The trial court, however, concluded that they were immune from liability.

As a preliminary matter, the parties disagree about whether the affirmative defense of legislative immunity was properly before the trial court, and thus, a defense upon which the trial court's judgment could rest. Because the Board members pleaded neither the specific affirmative defense of legislative immunity nor a general "immunity" affirmative defense, we conclude the defense was not properly before the trial court, and therefore, it is not properly before this court. *See Kinnear v. Texas Comm'n on Human Rights*, 14 S.W.3d 299, 300 (Tex.2000) (determining that state agency waived its affirmative defense of sovereign immunity because it was not pled). Thus, our review is limited to determining whether the trial court properly concluded that the affirmative defense of official immunity shielded the Board members from liability.[2]

While serving in public office, public officials in Texas are immune from suits

2. In their second amended answer, the Board members asserted the affirmative defenses of official immunity, sovereign immunity, and governmental immunity. As their names imply, sovereign and governmental immunity shield the sovereign from liability. Where the liability of a governmental officer is concerned, rather than the sovereign itself, the question is one of official immunity, not sovereign or governmental immunity. *Baker v. Story*, 621 S.W.2d 639, 643 (Tex.Civ.App.—San Antonio 1981, writ ref'd n.r.e.).

228 ■

arising out of the performance of discretionary duties in good faith within the scope of their authority. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). On appeal, Champion argues that the Board members failed to establish each element of their affirmative defense as a matter of law. In this court's original opinion, we applied the standard used to review immunity at the summary judgment level, rather than the standard by which a judgment n.o.v. is reviewed. We compounded the problem by misconstruing how good faith should be evaluated.

■ Champion first takes issue with the trial court's implicit finding that the Board members' act of revoking the building permit was a discretionary act to which immunity would attach. Champion argues that the Board members' action was ministerial in nature, and thus not cloaked with official immunity because the Board members had no discretion to revoke the permit. Champion claims that because its project complied with all city code requirements and ordinances, Ordinance No. 634, the source of the Board members' authority, mandated that the Board deny a request to revoke the permit. Champion thus concludes that Ordinance No. 634 left nothing to the Board members' discretion, and therefore, the Board members' failure to deny the request to revoke the permit was a refusal to perform a ministerial function. We disagree.

■ Actions requiring personal deliberation, decision, and judgment are considered discretionary; those actions which require obedience to orders or the performance of a duty to which the actor has no choice are ministerial. *Id.* at 654. The distinction between these two categories is often one of degree as any ministerial act requires the actor to use some discretion in its performance. *Baker v. Story*, 621 S.W.2d 639, 645 (Tex.App.—San Antonio 1981, writ ref'd n.r.e.). Thus, to determine whether an act is ministerial or discretionary involves examining the law or regulation controlling the acts of the official in a particular situation. *Barker v. City of Galveston*, 907 S.W.2d 879, 888 (Tex. App.—Houston [1st Dist.] 1995, writ denied).

Here, the controlling regulation is City of Terrell Hills Ordinance 634. As noted, within days after the issuance of Champion's permit, a group of Terrell Hills residents sought an appeal of that decision, arguing that the project did not comply with the frontage requirement of Ordinance 634. The Board was thus asked to interpret and apply the disputed requirement of Ordinance 634. Notably, two legal interpretations of the ordinance were before the Board, one advanced by the Terrell Hills city attorney and one by the attorney for the residents. Such a task—construction and application of a city ordinance—necessarily required of the Board members deliberation, decision, and judgment. That is, it cannot be said that the Board's function of review involved "obedience to orders or the performance of a duty to which the actor had no choice" so as to make the Board members' actions ministerial in nature. *See Chambers*, 883 S.W.2d at 654. Thus, such action was discretionary in nature. *See id.*

■ Champion's "scope of authority" argument is flawed for similar reasons. The gravamen of Champion's argument in this sub-issue focuses on the impromptu executive session the Board members entered into during the public meeting. Champion argues that because such a meeting was illegal, the resulting action—the revocation—was therefore taken outside the scope of the Board members' authority.

■ An official acts within the scope of his authority when he is discharging a duty generally assigned to him. *Id.* at 658. Ordinance 634 plainly shows that the Board members were discharging duties assigned to them when they heard the appeal and voted to revoke the building permit. By its terms, Ordinance 634 empowered the Board to:

> hear and decide appeals where it is alleged there is error in any order, requirement, decision, or determination made by an administrative official in the enforcement of this ordinance.

And in executing such duty, Ordinance 634 authorized the Board members to:

> reverse or affirm, wholly or partly, or ... modify the order, requirement, decision or determination appealed from and make such order, requirement, decision or determination as ought to be made, and to that end shall have all the powers of the officer from whom the appeal is taken.

That the Board members may have made an incorrect decision does not mean they were acting outside their scope of authority to revoke Champion's permit. *See id.*

Finally, we turn to the issue of good faith. Good faith may be evaluated objectively or subjectively. In some instances, only a subjective standard is applied. For example, in transactions governed by the Texas Business and Commerce Code, the actual belief of the party, and not the reasonableness of that belief, controls. *See La Sara Grain v. First Nat'l Bank,* 673 S.W.2d 558, 563 (Tex.1984). In other instances, the standard applied incorporates both subjective and objective good faith; thus, an executor acts in good faith when he believes his action is viable, if that belief is reasonable in light of existing law. *Lee v. Lee,* 47 S.W.3d 767, 794 (Tex.App.— Houston [14th Dist.] 2001, pet. denied). This mixture of objective and subjective analysis abounds in the law. *See Goode v. Shoukfeh,* 943 S.W.2d 441, 446, (Tex.1997) (discussing *Batson* objections to peremptory challenges); *Quantum Chem. Corp. v. Toennies,* 47 S.W.3d 473, 479 (Tex.2001) (discussing unlawful employment practices).

■ Courts employ an objective standard in analyzing official immunity. In *Chambers,* the court set out the standard for evaluating an officer's good faith in undertaking a high-speed chase of a suspect. 883 S.W.2d at 656. It is not enough for an officer to argue that he believed the need for apprehension justified the pursuit. That is, his subjective belief is not relevant. Instead, the court imposed an objective standard, holding that an officer acts in good faith if "a reasonably prudent officer, under the same or similar circumstances, could have believed the need to immediately apprehend the suspect outweighed a clear risk of harm to the public in continuing the pursuit." *Id.* In applying this test of objective reasonableness instead of subjective good faith, the court acknowledged that the doctrine of official immunity is intended to protect officials from suit even if they act negligently. *Id.* at 655. Indeed, if officials performed their duties without error or negligence, there would be no need for such a doctrine. *See id.* The doctrine cannot be stretched, however, to provide immunity to an official whose subjective bad faith is demonstrated in the record.

In *Winograd v. Clear Lake City Water Authority,* 811 S.W.2d 147 (Tex.App.— Houston [1st Dist.] 1991, writ denied), Winograd sued the city of Clear Lake Water Authority and its individual board members after the board refused to honor a commitment to provide sewer services to a 65 acre tract of land Winograd owned. *Id.* at 150. He claimed the city's unlawful actions denied him his constitutionally pro-

tected rights to due process and equal protection. *Id.* The jury rendered a verdict in Winograd's favor but the trial court rendered a judgment n.o.v. *Id.* The court noted that personal liability may be imposed on a governmental official for actions taken under color of law in violation of a plaintiff's rights, or for an abuse of office. *Id.* at 158. The court further noted that an official's subjective good faith is a question of fact requiring resolution by a jury. *Id.* at 159.

In holding the evidence was sufficient to support the jury's answer that the directors acted illegally and with conscious disregard of the rights of others, the court identified several comments similar to those expressed in the case before us, e.g., a typical apartment complex would hold "333 robbers and rapists." Here, there was no claim of constitutional violations, thus we do not analyze the evidence in quite the same manner. Nevertheless, we do examine the evidence.

The Austin court of appeals addressed the component of good faith of an official asserting an immunity defense in *Dalrymple v. University of Texas System,* 949 S.W.2d 395, 401–02 (Tex.App.—Austin 1997), *rev'd on other grounds sub nom. Brewerton v. Dalrymple,* 997 S.W.2d 212 (Tex.1999). The court determined that the *Chambers* test could impose an onerous burden on the party challenging good faith because even an intentional, ill-motivated action could be explained by some plausible, yet hypothetical, rationale. *Id.* The court noted it did not believe the *Chambers* test was intended to eliminate completely the subjective element and transform the "good faith" test into a "good pretext" text. *Id.* The court concluded that the court in *Chambers* did not elimi-

nate the subjective component of the good faith analysis insofar as it is necessary to determine whether an official was plainly incompetent or violated the law.[3] We agree with this reasoning, and hold that we are not required to turn a blind eye to evidence of bad faith. With this in mind, we now turn to the element of good faith and the evidence before the jury.

In its answer to questions one and five, the jury found that each of the defendant Board members was negligent and grossly negligent. In answer to question sixteen, it found that none of the Board members was entitled to official immunity. When the pleadings and evidence raise factual issues for the jury's determination, a directed verdict is not proper. *Wuertz v. Wilson,* 922 S.W.2d 268, 271 (Tex.App.—Austin 1996, no writ). If any evidence of probative force supports a contested issue, a judgment n.o.v. is improperly rendered. *Id.* Accordingly, we examine the record to determine if any evidence of probative force supports the jury's determination that the Board members were negligent and, impliedly, did not act in good faith. The following evidence adduced at trial is favorable to the jury's findings:

(1) the record of the executive session that shows the revocation was based not on a frontage problem, but rather on a perceived problem regarding potential renters, a session in which the personal biases of the board members were evident;

(2) testimony from Cal Johnson, the city manager, that he was unaware of any other instance where the Board considered revoking a permit, convening in

---

**3.** At the federal level, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *See Swint v.* *City of Wadley,* 51 F.3d 988, 995 (11th Cir. 1995).

executive session, or acting in contravention of the advice of the city attorney; (3) the written recommendation of city attorney Charles Biery to the Board, advising it that no legal grounds existed to revoke the permit, and describing their function as "ministerial"; and

(4) testimony from Phil Garay, a planning and zoning consultant, who testified he did not believe that the Board members acted reasonably at the meeting in question.

This is more than a scintilla of probative evidence to support the jury's findings; thus, the trial court erred when it rendered judgment n.o.v.

On rehearing, we sustain point of error one.

### REGULATORY TAKINGS

We next consider whether the trial court properly disregarded the jury's findings regarding Champion's takings claims. As noted, the trial court ruled in favor of the defendants, finding that the evidence failed to establish a compensable taking and that the award of damages was supported by insufficient evidence.

██ A compensable regulatory taking occurs when a governmental agency imposes restrictions that either deny a landowner all economically viable use of his property, or unreasonably interfere with a landowner's rights to use and enjoy his property. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex.1998). Determining whether all economically viable use of a property has been denied entails an analysis of whether value remains in the property after the government action. *Id.* Determining whether the government has unreasonably interfered with a landowner's right to use and enjoy property requires a consideration of two factors: (1) the economic impact of the regulation; and

(2) the extent to which the regulation interferes with distinct investment-backed expectations. *Id.* The first factor, the economic impact of the regulation, compares the value that has been taken from the property with the value that remains in the property. *Id.* at 936. The loss of anticipated gains or potential future profits is not usually considered in this analysis. *Id.* The second factor focuses mainly on the investment-backed expectation of the landowner. *Id.* The existing and permitted uses of the property constitute the "primary expectation" of the landowner that is affected by regulation. *Id.* Knowledge of existing zoning laws is to be considered in determining whether the regulation interferes with investment-backed expectation. *Id.*

██ As noted, Champion asserted three takings claims against the City and the Board, two claims involving regulatory takings and one procedural due process claim. Champion abandoned its procedural due process claim at trial by not submitting a question on it to the jury. *See* Tex.R. Civ. P. 279; *Pitman v. Lightfoot*, 937 S.W.2d 496, 518–19 (Tex.App.—San Antonio 1996, writ denied) (noting that party relying on issue has burden to request jury question on it). Thus, any issues tied to Champion's procedural due process claim are not properly before this court on appeal.

### *Revocation of Permit*

██ As noted, Champion's first regulatory taking claim focuses on the Board's revocation of its permit. As pleaded and argued at trial, the gist of Champion's argument is that the act of revocation set in motion a legal dispute that delayed and ultimately tabled the project. According to Champion, the act of revocation thus constituted a taking because it denied

Champion the use and benefit of its property.

We agree that the revocation of the permit set in motion a series of events that tabled Champion's project. We cannot agree, however, that such action constitutes a regulatory taking as a matter of law. As the name implies, the term "regulatory taking" refers to situations in which the government restricts the use of land. *City of Cincinnati v. Chavez Props.*, 117 Ohio App.3d 269, 690 N.E.2d 561, 564 (1996) (quoting SHONKWILER & MORGAN, LAND USE LITIGATION (1986) 6, Section 1.02(1)). Restriction of the use of land is often accomplished through implementation of land use planning, zoning, and building codes. *Id.* Here, Champion is not challenging the application of a governmentally-imposed restriction. That is, Champion is not arguing that the frontage requirement of Ordinance 634, the ostensible reason for the Board's action, unreasonably interfered with the use and enjoyment of its property. Rather, its theory of liability rests solely upon the proposition that because the revocation eventually led to the ruination of the project, the revocation constituted a regulatory taking. Having found no legal support for the proposition that such a claim is actionable as a regulatory takings claim, we hold that the trial court properly concluded that Champion failed to establish a compensable taking on this first-stated takings claim. Thus, the judgment n.o.v. on this takings claim was proper.

The same result would obtain even if Champion's claim were tied to the Board's interpretation or application of Ordinance 634. As noted, two months after the revocation, the Board's decision was reversed by the trial court and the reissuance of the permit was ordered. Thus, after August 1994, any delay or inactivity on the project was due to the collateral implications that stemmed from the resulting legal dispute between the residents and Champion, and not from the application of a governmentally-imposed restriction.

### *Ordinance 929*

■ Champion's second-stated takings claim is based upon the application of Ordinance 929, which increased the minimum square footage requirement for single family apartment units from 800 square feet to 1200 square feet. As noted, Champion's project called for six units, each unit being 900 square feet. At trial, Spears testified that after the City passed Ordinance 929, which became effective January 1996, the project "was over." Spears indicated that this area modification would have required him to revamp his plans and scale down the project yet again.

This second regulatory takings claim fails, not because it facially does not meet the requirements of a regulatory takings claim, but because there is no evidence of causation. Stated differently, there is no evidence to support the proposition that the application of Ordinance 929 denied Champion all economically viable use of its property or unreasonably interfered with Champion's rights to use and enjoy its property. This is so because the record reveals that Champion did not learn about the existence of this ordinance until October 1996—four months after Champion filed the underlying lawsuit. Thus, it cannot be said that Ordinance 929 *actually* denied all economically viable use of Champion's property or unreasonably interfered with Champion's rights to use and enjoy its property. At best, and as Spears' testimony suggests, it could be said that the application of Ordinance 929 *could have* unreasonably interfered with Champion's rights to use and enjoy its property. Because there is no evidence that supports Champion's claim of harm from Ordinance 929 other than Spears'

speculation that its application would have killed its project, we hold that the trial court properly concluded that Champion failed to establish a compensable taking on this second-stated takings claim. Thus, the judgment n.o.v. on this takings claim was also proper. We overrule point of error two.

### CONCLUSION

Having overruled point of error two, we affirm the trial court's judgment n.o.v. in regard to the issue of whether there was a compensable taking. Having sustained point of error one, we reverse the trial court's judgment n.o.v. in regard to the liability of the Board members, and remand the cause for entry of judgment in accordance with the jury's findings.

Dissenting opinion by SARAH B. DUNCAN, Justice (joined by Justice GREEN and Justice ANGELINI).

SARAH B. DUNCAN, Justice, dissenting on denial of further reconsideration en banc, joined by Justice GREEN and Justice ANGELINI.

This Court's duty is clear: It must follow the pronouncements of the Supreme Court of Texas. *Lofton v. Texas Brine Corp.,* 777 S.W.2d 384, 386 (Tex.1989). And the Supreme Court's pronouncement of the law applicable to this dispute could not be more clear: "[A] court must measure good faith in official immunity cases against a standard of objective legal reasonableness *without regard to the officer's subjective state of mind."* *Wadewitz v. Montgomery,* 951 S.W.2d 464, 466 (Tex.1997). In defiance of the Supreme Court's pronouncement, the majority holds "we are not required to turn a blind eye to evidence of bad faith." I dissent.