TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-01-00680-CV







Texas Department of Public Safety, Appellant



v.



Jody Cordes, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT


NO. GN001726, HONORABLE CHARLES F. CAMPBELL, JR., JUDGE PRESIDING







 Appellant Texas Department of Public Safety ("DPS") appeals the denial of its
motion for summary judgment. The issue on appeal is whether DPS conclusively established the
elements of its affirmative defense of official immunity, thereby entitling it to summary judgment. 
We will affirm the judgment of the district court.


BACKGROUND

 On February 5, 1999, Highway Patrol Corporal Dana Moore was on patrol near the
town of Buda. At approximately 7:00 p.m., Corporal Moore received a DPS communications
broadcast that Trooper Mike Moore was involved in a pursuit in Corporal Moore's assigned area of
South Travis County. Corporal Moore and his partner, Trooper Sean Davis, drove directly to the
area of the pursuit and arrived immediately after the suspects were apprehended. Corporal Moore
then received a call that Trooper Jason Oakley, another trooper in Corporal Moore's area, had been
involved in an accident on Dittmar Road. While in route to the accident location, Corporal Moore
attempted to turn left from Manchaca Lane onto Dittmar Road. Corporal Moore failed to yield to
oncoming traffic, and a vehicle driven by Jody Cordes collided with his patrol car.

 On June 15, 2000, Cordes filed suit against DPS claiming Corporal Moore's
negligence proximately caused the accident and her injuries. On November 7, 2001, DPS filed a
motion for summary judgment claiming that it established the elements of the affirmative defense
of official immunity as a matter of law. On November 28, the district court denied DPS's motion
for summary judgment; DPS appeals the order. See Tex. Civ. Prac. & Rem. Code Ann.
§ 51.014(a)(5) (West Supp. 2002) ("A person may appeal from an interlocutory order . . . that denies
a motion for summary judgment that is based on an assertion of immunity by an individual who is
an officer or employee of the state.").


DISCUSSION

 Because the propriety of a summary judgment is a question of law, we review the trial
court's decision de novo. Natividad v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994); Texas Dep't
of Ins. v. American Home Assurance Co., 998 S.W.2d 344, 347 (Tex. App.--Austin 1999, no pet.). 
The standards for reviewing a motion for traditional summary judgment are well established: (1) the
movant for summary judgment has the burden of showing that no genuine issue of material fact
exists and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed
material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken
as true; and (3) every reasonable inference must be indulged in favor of the nonmovant and any
doubts resolved in its favor. Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985). 
The function of summary judgment is not to deprive litigants of the right to trial by jury, but to
eliminate patently unmeritorious claims and defenses. Swilley v. Hughes, 488 S.W.2d 64, 68 (Tex.
1972). 

 Official immunity is an affirmative defense that protects government employees from
personal liability. University of Houston v. Thomas, 28 S.W.3d 578, 580 (Tex. 2000) (citing City
of Lancaster v. Chambers, 883 S.W.2d 650, 653 (Tex. 1994)). When official immunity shields a
government employee from liability, sovereign immunity shields a government employer from
vicarious liability. Id. (citing DeWitt v. Harris County, 904 S.W.2d 650, 653 (Tex. 1995)). A
government employee is entitled to official immunity: (1) for the performance of discretionary
duties; (2) within the scope of the employee's authority; (3) provided the employee acts in good
faith. Id. On appeal, Cordes does not contest that Corporal Moore acted within the scope of his
authority. Accordingly, the issue is whether DPS's summary judgment evidence conclusively
establishes the "discretionary" and "good faith" elements of the official immunity defense. See
Wadewitz v. Montgomery, 951 S.W.2d 464, 466 (Tex. 1997).


Discretionary Act

 In determining whether a government employee's action is discretionary, "the court's
focus should be on whether the officer is performing a discretionary function, not on whether the
officer has discretion to do an allegedly wrongful act while discharging that function." Chambers,
883 S.W.2d at 653. If an action involves personal deliberation, decision, and judgment, it is
discretionary; actions that require obedience to orders or the performance of a duty to which the actor
has no choice are ministerial. Id. "The distinction between these two categories is often one of
degree as any ministerial act requires the actor to use some discretion in its performance." Champion
Builders v. City of Terrell Hills, 70 S.W.3d 221, 228 (Tex. App.--San Antonio 2001, pet. filed).

 At least two courts of appeals have held that "absent special circumstances that
suggest the officer was performing a discretionary function, such as joining in a high speed chase,
. . . an officer driving a motor vehicle while on official, non-emergency business is performing a
ministerial act." City of Wichita Falls v. Norman, 963 S.W.2d 211, 216-17 (Tex. App.--Fort Worth
1998, pet. dism'd w.o.j.); Woods v. Moody, 933 S.W.2d 306, 308 (Tex. App.--Houston [14th Dist.]
1996, no writ). In Woods, the court of appeals recognized the Superior Court of Connecticut's
holding that "the activities of the police officer in driving her car to the scene of an accident
represented the performance of ministerial acts." 933 S.W.2d at 308 (citing Letowt v. City of
Norwalk, 41 Conn. Supp. 402, 579 A.2d 601 (Conn. Super. Ct. 1989)).

 As summary judgment evidence of the discretionary nature of Corporal Moore's
actions, DPS offered his affidavit testimony:


I knew that Trooper Oakley had been involved in the high speed pursuit, that he was
new to the force, that it was after dark, that he was not familiar with Dittmar Road,
and that it is an unlit, two-lane windy road which narrows to a one-lane bridge. I
considered this an emergency situation, and believed that I needed to proceed to
Trooper Oakley's location as quickly as possible, since he could be injured, or his
vehicle could be blocking the roadway on an unlit street and possible [sic] causing
other vehicles to wreck. I also knew that Trooper Oakley was by himself that night
on patrol, that the only other officers on duty were Sean Russell, who was partnered
with me, and Walt Goodson and Michael Moore, who were processing and
transporting suspects.



DPS contends that because Corporal Moore was responding to what he thought was an emergency,
his actions at the time of the collision with Cordes were discretionary.

 To rebut this testimony, Cordes presented evidence that Corporal Moore was acting
in the routine course of responding to an accident report as ordered. She offered Corporal Moore's
deposition testimony that, in contrast to his affidavit testimony, he was not certain of the location
of Trooper Oakley's accident:


There was confusion. I've been in the Austin area for a couple of decades, and I was
familiar with South Austin. I was given the location. I was told it was Dittmar Lane. 
On the way to Oakley's collision, I contacted DPS communications because I wanted
clarification on the location. I told communications that I was traveling south on
Manchaca, approaching Dittmar. Do I need to turn left or right? I was told right. 
And I don't know exactly why, but I think I had it in my mind that it was to the left.



Cordes contends that this testimony controverts Corporal Moore's affidavit testimony that he was
familiar with and had personal knowledge of the dangerous characteristics of the area where the
accident occurred. Cordes implies that this testimony creates a fact issue as to whether Corporal
Moore was familiar enough with the area to consider Trooper Oakley's accident an emergency
situation.

 To further support her contention that DPS has failed to establish that Corporal
Moore's actions were discretionary as a matter of law, Cordes offered Corporal Moore's deposition
to show that he was proceeding as directed to the location of Trooper Oakley's accident in a
deliberate and orderly manner:


Well, first of all, I was not at any time driving or breaking any traffic law whatsoever. 
There was no speed involved other than the posted speed limit. I did not go through
any red lights. I came to complete stops. I was driving--even though I was going
to an emergency, I was still driving in a normal and reasonable--up until the
collision point--reasonable manner. There was [sic] no laws being violated.



Contradicting his assertion that he was responding to an emergency, the record reflects that Corporal
Moore had not activated his emergency siren or lights at the time of his collision with Cordes. 
Indulging every reasonable inference and resolving any doubts in Cordes's favor, we cannot say that
DPS established as a matter of law that Corporal Moore "was performing a discretionary function,
such as joining in a high speed chase" or responding to an emergency.


Good Faith

 In the event we are mistaken in holding that DPS did not prove as a matter of law that
Corporal Moore was performing a discretionary act, we further determine that DPS did not establish
the additional prong necessary to claim official immunity. The courts have established certain
reasonable criteria to determine whether an officer's action was in good faith. The issue need not
suggest any malicious or improper conduct but generally balances the officer's need to act in a
manner that caused the harm. In Chambers, the supreme court formulated a test for official
immunity's good faith element in police pursuit cases. See Chambers, 883 S.W.2d at 656. The court
recognized the competing interests involved in good faith cases: (1) the injustice of imposing liability
on an officer whose job requires him to exercise discretion and the danger that such liability will
deter his willingness to exercise that discretion for the public good; and (2) the rights of the public
who are affected by an officer's bad faith acts. Id. To obtain summary judgment on good faith in
a pursuit case, the court held that a police officer must prove that a reasonably prudent officer, under
the same or similar circumstances, could have believed that the need to immediately apprehend the
suspect outweighed a clear risk of harm to the public in continuing the pursuit. Id. at 656-57. "But
to controvert a police officer's summary judgment proof on good faith, the nonmovant must do more
than show that a reasonably prudent officer could have decided to stop the pursuit." Id. at 657. The
nonmovant must show that no reasonable person in the officer's position could have thought the
facts justified the officer's acts. Id. at 656.

 While Chambers was a police pursuit case, the supreme court extended its reasoning
to cover emergency response cases in Wadewitz. 951 S.W.2d at 457 (holding officer responding to
emergency did not establish good faith because summary judgment evidence did not show he
evaluated risks created by his actions in route to emergency). In Wadewitz, the court elaborated on
the Chambers good faith test's risk and need elements in the context of emergency responses:


The need element refers to the "urgency of the circumstances requiring police
intervention," or "the seriousness of the crime or accident to which the officer
responds, whether the officer's immediate presence is necessary to prevent injury or
loss of life or to apprehend a suspect, and what alternative courses of action, if any,
are available to achieve a comparable result." The risk element of good faith refers
to "the countervailing public safety concerns," or "the nature and severity of harm
that the officer's actions could cause (including injuries to bystanders as well as the
possibility that an accident could prevent the officer from reaching the scene of an
emergency), the likelihood that any harm would occur, and whether any risk of harm
would be clear to a reasonably prudent officer."



Clark, 38 S.W.3d at 581 (citing Wadewitz, 951 S.W.2d at 467) (citations omitted). In Clark, the
supreme court summarized the general considerations for determining whether an officer has acted
in good faith: "the seriousness of the crime or accident to which the officer responds, whether the
officer's immediate presence is necessary to apprehend a suspect or to prevent injury or loss of life,
and what alternative courses of action, if any are available to achieve a comparable result." Id. at
582. Balancing risk and need must be done in light of the particular circumstances of each case. Id.
at 583.

 As summary judgment evidence of Corporal Moore's good faith, DPS again offers
his affidavit testimony:


I then traveled back to the intersection at Manchaca and Dittmar. I slowed down,
turned on my left blinker, and moved into the turn lane. The light was green. There
was a vehicle stopped directly opposite me in the turn lane of Manchaca, heading
north, waiting to make a left hand turn. I did not believe this vehicle obstructed my
view. I made a complete stop at the light, looked and did not see Ms. Cordes' [sic]
vehicle and I did not observe any vehicles moving, so I proceeded through the
intersection again at a maximum speed of around 15 miles per hour. After having
viewed all the lanes of traffic and not observing any vehicles moving or Ms. Cordes'
[sic] vehicle I believed there was a minimal, if any, risk that my actions in proceeding
the rest of the way through the intersection would cause harm to other motorists,
bystanders, or an increased risk of accident.


****


Based on my knowledge of what Trooper Oakley was engaged in immediately prior
to the accident; how many other troopers were available to respond to this accident,
and the one-lane bridge on a blind curve, I believed in good faith that the accident
was creating a dangerous situation and that my immediate presence was necessary. 
I used good faith in determining which route to take in order to respond to the call. 
When I proceeded through the intersection of Manchaca and Dittmar Road on
February 5, 1999, including when I continued to proceed through the intersection
after stopping at the green light and observing no cars traveling in the northbound
lanes of Manchaca, but prior to being hit by Ms. Cordes' [sic] vehicle, there was
minimal risk, if any, of harm to other motorists or bystanders as a result of my
decision to proceed. There was also minimal risk of causing an accident and possible
[sic] not being able to assist Trooper Oakley, as I had observed no cars traveling in
the northbound lanes of Manchaca after making a complete stop at the intersection. 
In this instance, I used my best judgment as an [sic] trained officer of the law to
determine my best course of action under the circumstances.



In contrast, Corporal Moore stated in his deposition as follows:


Q. Okay. Now, you were coming out--there was a vehicle directly across from you;
is that correct?


A. Yes.


Q. Did that vehicle in any way obstruct your vision of those northbound lanes?


A. Well, yes, it certainly did.


Q. Okay. And was that vehicle still sitting there at the time of this impact as far as
you know?


A. I don't know. It's my recollection that it was still sitting there.


Q. You don't recall seeing that vehicle going ahead with its left turn?


A. No. My recollection is that when I was making my turn--or, started my turn, it
was still there.


****


Q. And so you had just started moving; you were going on through the intersection?


A. Well, I was trying to enter into the intersection, yes.


Q. Right. But you didn't--you didn't come to a stop--you didn't pull out a little bit,
and then stop so you could see, right?


A. No.


****


A. What I, in my opinion, didn't do long enough was to wait long enough to make
sure there wasn't a car hidden behind the car in front of me. That's where I think
I erred in not waiting. If I had waited just a second more, then probably I would
have seen Ms. Cordes's vehicle and not attempted to turn.


****


A. Well, I'm going to go back to what I said a while ago. Had I--had I stopped and
stayed--remained stopped for a second or so more, then I more than likely--in
fact, I'm convinced I would have seen the movement of her vehicle coming out
from behind the one that was in front of me. So in that respect, yeah, I think that
does answer your question, yeah, it would have been reasonable and prudent had
I stopped a little bit longer. Because I did look.

In light of the conflicting nature of Corporal Moore's affidavit and deposition testimony, we cannot
say that DPS has established its entitlement to summary judgment as matter of law. See Wadewitz,
951 S.W.2d at 467. Further, the only reference to "alternative courses of action, if any are available
to achieve a comparable result" is made in Corporal Moore's deposition: "If I had waited just a
second more, then probably I would have seen Ms. Cordes's vehicle and not attempted to turn." 
Indulging every reasonable inference and resolving any doubts in Cordes's favor, DPS did not
establish as a matter of law that Corporal Moore was performing a discretionary duty in good faith
at the time of the collision. Accordingly, we overrule DPS's issue.


CONCLUSION

 We overrule appellant's issue. Accordingly, we affirm the trial court's order denying
DPS summary judgment.



 

 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel

Affirmed

Filed: July 26, 2002

Publish