Texas **DEPARTMENT OF PUBLIC SAFETY, Appellant,**

v.

**Jody CORDES, Appellee.**

**No. 03–01–00680–CV.**

Court of Appeals of Texas, Austin.

July 26, 2002.

Rehearing Overruled Sept. 19, 2002.

Kamilla L. Stokes, Assistant Attorney General, Austin, for Appellant.

R. Allen Rogers, The Dunham Law Firm, Austin, for Appellee.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and YEAKEL.

MARILYN ABOUSSIE, Chief Justice.

Appellant Texas Department of Public Safety ("DPS") appeals the denial of its motion for summary judgment. The issue on appeal is whether DPS conclusively established the elements of its affirmative defense of official immunity, thereby entitling it to summary judgment. We will affirm the judgment of the district court.

## BACKGROUND

On February 5, 1999, Highway Patrol Corporal Dana Moore was on patrol near the town of Buda. At approximately 7:00 p.m., Corporal Moore received a DPS communications broadcast that Trooper Mike Moore was involved in a pursuit in Corporal Moore's assigned area of South Travis County. Corporal Moore and his partner, Trooper Sean Davis, drove directly to the area of the pursuit and arrived immediately after the suspects were apprehended. Corporal Moore then received a call that Trooper Jason Oakley, another trooper in Corporal Moore's area, had been involved in an accident on Dittmar Road. While in route to the accident location, Corporal Moore attempted to turn left from Man-

chaca Lane onto Dittmar Road. Corporal Moore failed to yield to oncoming traffic, and a vehicle driven by Jody Cordes collided with his patrol car.

On June 15, 2000, Cordes filed suit against DPS claiming Corporal Moore's negligence proximately caused the accident and her injuries. On November 7, 2001, DPS filed a motion for summary judgment claiming that it established the elements of the affirmative defense of official immunity as a matter of law. On November 28, the district court denied DPS's motion for summary judgment; DPS appeals the order. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(5) (West Supp.2002) ("A person may appeal from an interlocutory order ... that denies a motion for summary judgment that is based on an assertion of immunity by an individual who is an officer or employee of the state.").

## DISCUSSION

Because the propriety of a summary judgment is a question of law, we review the trial court's decision *de novo*. *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 699 (Tex.1994); *Texas Dep't of Ins. v. American Home Assurance Co.*, 998 S.W.2d 344, 347 (Tex.App.-Austin 1999, no pet.). The standards for reviewing a motion for traditional summary judgment are well established: (1) the movant for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law; (2) in deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true; and (3) every reasonable inference must be indulged in favor of the nonmovant and any doubts resolved in its favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). The function of summary judgment is not to deprive litigants of the right to trial by jury, but to eliminate patently unmeritorious claims and defenses. *Swilley v. Hughes*, 488 S.W.2d 64, 68 (Tex.1972).

Official immunity is an affirmative defense that protects government employees from personal liability. *University of Houston v. Thomas*, 38 S.W.3d 578, 580 (Tex.2000) (citing *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994)). When official immunity shields a government employee from liability, sovereign immunity shields a government employer from vicarious liability. *Id.* (citing *DeWitt v. Harris County*, 904 S.W.2d 650, 653 (Tex.1995)). A government employee is entitled to official immunity: (1) for the performance of discretionary duties; (2) within the scope of the employee's authority; (3) provided the employee acts in good faith. *Id.* On appeal, Cordes does not contest that Corporal Moore acted within the scope of his authority. Accordingly, the issue is whether DPS's summary judgment evidence conclusively establishes the "discretionary" and "good faith" elements of the official immunity defense. *See Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex.1997).

### Discretionary Act

In determining whether a government employee's action is discretionary, "the court's focus should be on whether the officer is performing a discretionary function, not on whether the officer has discretion to do an allegedly wrongful act while discharging that function." *Chambers*, 883 S.W.2d at 653. If an action involves personal deliberation, decision, and judgment, it is discretionary; actions that require obedience to orders or the performance of a duty to which the actor has no choice are ministerial. *Id.* "The distinction between these two categories is

often one of degree as any ministerial act requires the actor to use some discretion in its performance." *Champion Builders v. City of Terrell Hills,* 70 S.W.3d 221, 228 (Tex.App.-San Antonio 2001, pet. filed).

At least two courts of appeals have held that "absent special circumstances that suggest the officer was performing a discretionary function, such as joining in a high speed chase, . . . an officer driving a motor vehicle while on official, non-emergency business is performing a ministerial act." *City of Wichita Falls v. Norman,* 963 S.W.2d 211, 216–17 (Tex.App.-Fort Worth 1998, pet. dism'd w.o.j.); *Woods v. Moody,* 933 S.W.2d 306, 308 (Tex.App.-Houston [14th Dist.] 1996, no writ). In *Woods,* the court of appeals recognized the Superior Court of Connecticut's holding that "the activities of the police officer in driving her car to the scene of an accident represented the performance of ministerial acts." 933 S.W.2d at 308 (citing *Letowt v. City of Norwalk,* 41 Conn.Supp. 402, 579 A.2d 601 (Conn.Super.Ct.1989)).

As summary judgment evidence of the discretionary nature of Corporal Moore's actions, DPS offered his affidavit testimony:

I knew that Trooper Oakley had been involved in the high speed pursuit, that he was new to the force, that it was after dark, that he was not familiar with Dittmar Road, and that it is an unlit, two-lane windy road which narrows to a one-lane bridge. I considered this an emergency situation, and believed that I needed to proceed to Trooper Oakley's location as quickly as possible, since he could be injured, or his vehicle could be blocking the roadway on an unlit street and possible [sic] causing other vehicles to wreck. I also knew that Trooper Oakley was by himself that night on patrol, that the only other officers on duty were Sean Russell, who was part-

nered with me, and Walt Goodson and Michael Moore, who were processing and transporting suspects.

DPS contends that because Corporal Moore was responding to what he thought was an emergency, his actions at the time of the collision with Cordes were discretionary.

To rebut this testimony, Cordes presented evidence that Corporal Moore was acting in the routine course of responding to an accident report as ordered. She offered Corporal Moore's deposition testimony that, in contrast to his affidavit testimony, he was not certain of the location of Trooper Oakley's accident:

There was confusion. I've been in the Austin area for a couple of decades, and I was familiar with South Austin. I was given the location. I was told it was Dittmar Lane. On the way to Oakley's collision, I contacted DPS communications because I wanted clarification on the location. I told communications that I was traveling south on Manchaca, approaching Dittmar. Do I need to turn left or right? I was told right. And I don't know exactly why, but I think I had it in my mind that it was to the left.

Cordes contends that this testimony controverts Corporal Moore's affidavit testimony that he was familiar with and had personal knowledge of the dangerous characteristics of the area where the accident occurred. Cordes implies that this testimony creates a fact issue as to whether Corporal Moore was familiar enough with the area to consider Trooper Oakley's accident an emergency situation.

To further support her contention that DPS has failed to establish that Corporal Moore's actions were discretionary as a matter of law, Cordes offered Corporal Moore's deposition to show that he was proceeding as directed to the location of

Trooper Oakley's accident in a deliberate and orderly manner:

> Well, first of all, I was not at any time driving or breaking any traffic law whatsoever. There was no speed involved other than the posted speed limit. I did not go through any red lights. I came to complete stops. I was driving—even though I was going to an emergency, I was still driving in a normal and reasonable—up until the collision point—reasonable manner. There was [sic] no laws being violated.

Contradicting his assertion that he was responding to an emergency, the record reflects that Corporal Moore had not activated his emergency siren or lights at the time of his collision with Cordes. Indulging every reasonable inference and resolving any doubts in Cordes's favor, we cannot say that DPS established as a matter of law that Corporal Moore "was performing a discretionary function, such as joining in a high speed chase" or responding to an emergency.

### Good Faith

In the event we are mistaken in holding that DPS did not prove as a matter of law that Corporal Moore was performing a discretionary act, we further determine that DPS did not establish the additional prong necessary to claim official immunity. The courts have established certain reasonable criteria to determine whether an officer's action was in good faith. The issue need not suggest any malicious or improper conduct but generally balances the officer's need to act in a manner that caused the harm. In *Chambers*, the supreme court formulated a test for official immunity's good faith element in police pursuit cases. *See Chambers*, 883 S.W.2d at 656. The court recognized the competing interests involved in good faith cases: (1) the injustice of imposing liability on an officer whose job requires him to exercise discretion and the danger that such liability will deter his willingness to exercise that discretion for the public good; and (2) the rights of the public who are affected by an officer's bad faith acts. *Id.* To obtain summary judgment on good faith in a pursuit case, the court held that a police officer must prove that a reasonably prudent officer, under the same or similar circumstances, could have believed that the need to immediately apprehend the suspect outweighed a clear risk of harm to the public in continuing the pursuit. *Id.* at 656–57. "But to controvert a police officer's summary judgment proof on good faith, the nonmovant must do more than show that a reasonably prudent officer could have decided to stop the pursuit." *Id.* at 657. The nonmovant must show that no reasonable person in the officer's position could have thought the facts justified the officer's acts. *Id.* at 656.

While *Chambers* was a police pursuit case, the supreme court extended its reasoning to cover emergency response cases in *Wadewitz*. 951 S.W.2d at 457 (holding officer responding to emergency did not establish good faith because summary judgment evidence did not show he evaluated risks created by his actions in route to emergency). In *Wadewitz*, the court elaborated on the *Chambers* good faith test's risk and need elements in the context of emergency responses:

> The need element refers to the "urgency of the circumstances requiring police intervention," or "the seriousness of the crime or accident to which the officer responds, whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect, and what alternative courses of action, if any, are available to achieve a comparable result." The risk element of good faith refers to "the countervailing public safety concerns," or "the nature

and severity of harm that the officer's actions could cause (including injuries to bystanders as well as the possibility that an accident could prevent the officer from reaching the scene of an emergency), the likelihood that any harm would occur, and whether any risk of harm would be clear to a reasonably prudent officer."

*Clark*, 38 S.W.3d at 581 (citing *Wadewitz*, 951 S.W.2d at 467) (citations omitted). In *Clark*, the supreme court summarized the general considerations for determining whether an officer has acted in good faith: "the seriousness of the crime or accident to which the officer responds, whether the officer's immediate presence is necessary to apprehend a suspect or to prevent injury or loss of life, and what alternative courses of action, if any are available to achieve a comparable result." *Id.* at 582. Balancing risk and need must be done in light of the particular circumstances of each case. *Id.* at 583.

■ As summary judgment evidence of Corporal Moore's good faith, DPS again offers his affidavit testimony:

I then traveled back to the intersection at Manchaca and Dittmar. I slowed down, turned on my left blinker, and moved into the turn lane. The light was green. There was a vehicle stopped directly opposite me in the turn lane of Manchaca, heading north, waiting to make a left hand turn. I did not believe this vehicle obstructed my view. I made a complete stop at the light, looked and did not see Ms. Cordes' [sic] vehicle and I did not observe any vehicles moving, so I proceeded through the intersection again at a maximum speed of around 15 miles per hour. After having viewed all the lanes of traffic and not observing any vehicles moving or Ms. Cordes' [sic] vehicle I believed there was a minimal, if any, risk that my actions in proceeding

the rest of the way through the intersection would cause harm to other motorists, bystanders, or an increased risk of accident.

* * * *

Based on my knowledge of what Trooper Oakley was engaged in immediately prior to the accident; how many other troopers were available to respond to this accident, and the one-lane bridge on a blind curve, I believed in good faith that the accident was creating a dangerous situation and that my immediate presence was necessary. I used good faith in determining which route to take in order to respond to the call. When I proceeded through the intersection of Manchaca and Dittmar Road on February 5, 1999, including when I continued to proceed through the intersection after stopping at the green light and observing no cars traveling in the northbound lanes of Manchaca, but prior to being hit by Ms. Cordes' [sic] vehicle, there was minimal risk, if any, of harm to other motorists or bystanders as a result of my decision to proceed. There was also minimal risk of causing an accident and possible [sic] not being able to assist Trooper Oakley, as I had observed no cars traveling in the northbound lanes of Manchaca after making a complete stop at the intersection. In this instance, I used my best judgment as an [sic] trained officer of the law to determine my best course of action under the circumstances.

In contrast, Corporal Moore stated in his deposition as follows:

Q. Okay. Now, you were coming out— there was a vehicle directly across from you; is that correct?

A. Yes.

Q. Did that vehicle in any way obstruct your vision of those northbound lanes?

A. Well, yes, it certainly did.

Q. Okay. And was that vehicle still sitting there at the time of this impact as far as you know?

A. I don't know. It's my recollection that it was still sitting there.

Q. You don't recall seeing that vehicle going ahead with its left turn?

A. No. My recollection is that when I was making my turn—or, started my turn, it was still there.

* * * *

Q. And so you had just started moving; you were going on through the intersection?

A. Well, I was trying to enter into the intersection, yes.

Q. Right. But you didn't—you didn't come to a stop—you didn't pull out a little bit, and then stop so you could see, right?

A. No.

* * * *

A. What I, in my opinion, didn't do long enough was to wait long enough to make sure there wasn't a car hidden behind the car in front of me. That's where I think I erred in not waiting. If I had waited just a second more, then probably I would have seen Ms. Cordes's vehicle and not attempted to turn.

* * * *

A. Well, I'm going to go back to what I said a while ago. Had I—had I stopped and stayed—remained stopped for a second or so more, then I more than likely—in fact, I'm convinced I would have seen the movement of her vehicle coming out from behind the one that was in front of me. So in that respect, yeah, I think that does answer your question, yeah, it would have been reasonable and prudent had I stopped a little bit longer. Because I did look.

In light of the conflicting nature of Corporal Moore's affidavit and deposition testimony, we cannot say that DPS has established its entitlement to summary judgment as matter of law. *See Wadewitz*, 951 S.W.2d at 467. Further, the only reference to "alternative courses of action, if any are available to achieve a comparable result" is made in Corporal Moore's deposition: "If I had waited just a second more, then probably I would have seen Ms. Cordes's vehicle and not attempted to turn." Indulging every reasonable inference and resolving any doubts in Cordes's favor, DPS did not establish as a matter of law that Corporal Moore was performing a discretionary duty in good faith at the time of the collision. Accordingly, we overrule DPS's issue.

### CONCLUSION

We overrule appellant's issue. Accordingly, we affirm the trial court's order denying DPS summary judgment.