# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00328-CV

**City of Austin, Texas, Appellant**

**v.**

**Librada Albarran, Appellee**

### FROM COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY
### NO. C-1-CV-09-002929, HONORABLE ERIC SHEPPERD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Librada Albarran sued the City of Austin (City) for money damages, alleging that it was vicariously liable for negligence and negligence per se of Austin Police Department (APD) Officer Scott Garner that had proximately caused an automobile accident resulting in personal injury and property damage to her.[1] She relied on the waiver of the City's governmental immunity created by section 101.021(1) of the tort claims act. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.021(1) (West 2011).[2] The City asserted derivative immunity based on Officer Garner's official immunity;

---

[1] Albarran did not name Officer Garner individually as a defendant.

[2] Section 101.021(1) provides that "[a] governmental unit in the state is liable for: (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if: (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and (B) the employee would be personally liable to the claimant according to Texas law." *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.021(1) (West 2011); *see also id.* § 101.025 (West 2011) (waiving immunity from suit "to the extent of liability created by this chapter").

i.e., that its governmental immunity was not waived by section 101.021(1) because Garner would have been entitled to the affirmative defense of official immunity and, thus, "would not be personally liable to the claimant according to Texas law." *See id*.; *City of Lancaster v. Chambers*, 883 S.W.2d 650, 658 (Tex. 1994). The City subsequently filed a traditional summary-judgment motion based on this ground. Following a hearing, the trial court denied the City's motion. The City appeals that order. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(8) (West 2008). Finding no error in the trial court's denial of summary judgment on this record, we will affirm.

We review summary-judgment rulings de novo, taking as true all evidence favorable to the nonmovant and indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). A court must grant summary judgment if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). Where, as here, a defendant moves for summary judgment based on an affirmative defense, the defendant-movant bears the burden of establishing each element of the affirmative defense as a matter of law. *Ryland Group v. Hood*, 924 S.W.2d 120, 121 (Tex. 1996) (per curiam).

The affirmative defense of official immunity "is based on the necessity of public officials to act in the public interest with confidence and without the hesitation that could arise from having their judgment continually questioned by extended litigation." *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 424 (Tex. 2004). The underlying policy is that officials should be

---

As there have been no material intervening substantive changes, we cite the current versions of statutes for convenience.

2

afforded some leeway to err because "the risk of some error is preferable to intimidation from action at all." *Id.* at 424 (citing *Wood v. Strickland*, 420 U.S. 308, 319-21 (1975)). To that end, official immunity shields officials "from being forced to defend their decisions that were reasonable when made, but upon which hindsight has cast a negative light." *Telthorster v. Tennell*, 92 S.W.3d 457, 461 (Tex. 2002). "Police officers' particular need for [official] immunity is well recognized: 'nowhere else in public service is official immunity more appropriate or necessary than in police work. In their routine work, police officers must be free to make split-second judgments . . . based on their experience and training, without fear of personal liability.'" *Id.* (quoting *Travis v. City of Mesquite*, 830 S.W.2d 94, 103 (Tex. 1992) (Cornyn, J., concurring)).

An officer's actions are shielded by official immunity when the following elements are proven: (1) the officer was performing a "discretionary" function or duty, (2) within the scope of his authority, (3) in "good faith." *Ballantyne*, 144 S.W.3d at 422; *Telthorster*, 92 S.W.3d at 461; *Chambers*, 883 S.W.2d at 653. Consequently, to prevail on summary judgment based on Garner's official immunity from liability arising from his collision with Albarran, the City had the burden to conclusively establish that, with respect to Garner's actions from which his liability would arise: (1) Garner was performing a "discretionary" function, (2) within the scope of his authority, (3) in "good faith." *See Telthorster*, 92 S.W.3d at 461.

The basic circumstances leading up to the collision were undisputed. The collision occurred on May 26, 2007, while Garner, driving an APD patrol car, was responding to a call reporting a "person down" at a furniture store on the east side of the intersection of North Lamar Boulevard and Wallingford Bend Drive in Austin. At this location, Lamar—one of the City's major

3

north-south arteries—has five lanes, with two northbound lanes, two southbound lanes, and a center turn lane. The Lamar-Wallingford Bend intersection is not controlled by a traffic light, nor are there stop signs on Lamar. To reach the scene, Garner drove south on Lamar without using his emergency lights or siren. As he approached the intersection with Wallingford Bend, Garner pulled into the left turn lane. Garner testified that he was aware that EMS had also been dispatched to the scene and that, from his location in the turn lane, he could see an ambulance that had already arrived, as well as a fire truck. The ambulance was parked on or along the northbound side of Lamar Boulevard, facing north.[3] Garner testified that he had intended to turn across the northbound lanes of Lamar and park behind the ambulance "to block and to prevent—a scene safety for them, if they had to load or unload a patient, to protect the scene." However, there was heavy oncoming traffic in the northbound lanes, including Albarran, who happened to be driving in the outermost northbound lane and approaching the scene. Garner testified that he turned on his car's overhead lights (although not his siren) to make the unprotected left turn across the oncoming traffic. While Albarran acknowledged seeing Garner stopped in the center turn lane waiting to turn, she claimed she never saw his emergency lights turned on.

Garner testified that the traffic in the innermost northbound lane stopped to allow him to turn, and he proceeded across that lane. He continued slowly into the outermost lane, Garner claimed, when he perceived that the next approaching vehicle in that lane—Albarran's—dipped forward, which indicated to him that she was braking to allow him to turn. On the other hand,

---

[3] The parties disagree as to whether the ambulance was partially obstructing the outer northbound lane of Lamar, as Garner claimed, or was pulled off the road, as Albarran maintained, but this dispute is immaterial to our analysis.

Albarran testified that she did not brake, but continued driving northward, slowly, as she observed the ambulance and fire truck with their emergency lights on. She further claimed that she had assumed Garner would wait for her to pass before turning, considering that she had not heard his siren or seen his emergency lights activated, and that she had been surprised when Garner's car suddenly collided with hers. Albarran asserts that Garner was negligent and negligent per se in, among other things, failing to yield the right-of-way to her and not keeping a proper lookout.[4]

Albarran has not questioned that the City established as a matter of law that Garner had been acting within the scope of his authority. The parties have joined issue, rather, as to whether the City met its burden to establish that Garner was performing a "discretionary" function and acting in "good faith" when the collision occurred. We need only address the former element.

"Discretionary" functions involve "personal deliberation, decision, and judgment," in contrast to "ministerial" acts, which "require obedience to orders or the performance of a duty to which the actor has no choice." *Chambers*, 883 S.W.2d at 654; *see Commissioner of the Gen. Land Office v. Smith*, 5 Tex. 471, 479 (1849) ("where the act to be done involves the exercise of discretion or judgment in determining whether the duty exists, it is not to be deemed merely ministerial"). An act is also said to be ministerial if "the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Chambers*, 883 S.W.2d at 654 (quoting *Rains v. Simpson*, 50 Tex. 495, 501 (1878)). In determining whether

---

[4] *See* Tex. Transp. Code Ann. §§ 545.152 (operator turning left "shall yield the right-of-way to a vehicle that is approaching from the opposite direction and that is in the intersection or in such proximity to the intersection as to be an immediate hazard") (West 2011), 545.156 (requiring operators to yield right-of-way and stop for emergency vehicles using audible and visual signals or only audible signals) (West 2011).

a government employee's action is "discretionary" versus "ministerial," the proper focus is "on whether the officer is performing a discretionary *function*, not on whether the officer has discretion *to do an allegedly wrongful act* while discharging that function." *Id*. at 653 (emphases added).

The City concedes that "[t]he law is clear that simple non-emergency driving by a police officer is a ministerial act" such that "an officer engaged in regular driving absent special circumstances, who is involved in an accident, is not entitled to official immunity." *See Harris County v. Gibbons*, 150 S.W.3d 877, 886 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (officer investigating possible stolen vehicle in non-emergency situation not shielded by official immunity); *Texas Dep't of Pub. Safety v. Cordes*, 85 S.W.3d 342, 345 (Tex. App.—Austin 2002, no pet.) (officer "acting in the routine course of responding to an accident report" not shielded by official immunity); *Wichita Falls v. Norman*, 963 S.W.2d 211, 216-17 (Tex. App.—Fort Worth 1998, pet. dism'd w.o.j.) (officer who caused collision while executing only patrol duties was not shielded by official immunity); *Woods v. Moody*, 933 S.W.2d 306, 308 (Tex. App.—Houston [14th Dist.] 1996, no writ) (official immunity did not shield officer who caused collision while en route to "County business"). The basic rationale of these decisions is that under normal circumstances, police officers, like other citizens, must obey traffic regulations when operating motor vehicles and do not have discretion regarding whether or not to do so. *City of Houston v. Daniels*, 66 S.W.3d 420, 425 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *accord Gibbons*, 150 S.W.3d at 886; *Norman*, 963 S.W.2d at 215; *Woods*, 933 S.W.2d at 308.

However, as the City emphasizes, Texas courts have recognized that a police officer's operation of a motor vehicle may be deemed a discretionary function in certain situations. These

situations include an officer's deciding to undertake and conducting of a high-speed pursuit of a suspect, *see Chambers*, 883 S.W.2d at 655, and an officer's decision to violate traffic laws in order to quickly reach a scene of suspected criminal activity and assist another officer there, *see Harless v. Niles*, 100 S.W.3d 390, 398 (Tex. App.—San Antonio 2002, no pet.). *See also City of San Angelo Fire Dep't v. Hudson*, 179 S.W.3d 695, 704 (Tex. App.—Austin 2005, no pet.) (manner of firefighters' driving in response to emergency call was discretionary function as matter of law); *City of Houston v. Flaniken*, 108 S.W.3d 555, 557 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (manner of operating ambulance in response to emergency situation was discretionary function as matter of law). Although these decisions sometimes speak in apparent circularities—e.g., a police officer performs a "discretionary" function when responding to an "emergency" because responding to an "emergency" entails discretion and judgment—their underlying principle seems to be that when a police officer is performing certain law enforcement functions involving discretion and judgment (e.g, pursuit and detention of suspects), it follows that this discretion and judgment can extend to whether and how the officer utilizes a motor vehicle in performing these functions. *See Chambers*, 883 S.W.2d at 654; *Harless*, 100 S.W.3d at 397-98; *see also Hudson*, 179 S.W.3d at 704; *Flaniken*, 108 S.W.3d at 557. In *Chambers*, for example, an officer's high-speed pursuit of a suspect who ran a red light was held to be a discretionary function because the officer had to elect whether to undertake pursuit, and "[b]eyond the initial decision to engage in the chase, a high speed pursuit involves the officer's discretion on a number of levels, including, which route should be followed, at what speed, should back-up be called for, and how closely should the fleeing vehicle be pursued." 883 S.W.2d at 655. In *Harless*, officers proceeding to the scene of "suspicious activity" to assist

7

a fellow officer similarly had discretion to determine, in the first instance, whether to respond to a report of ongoing criminal activity. 100 S.W.3d at 398. These circumstances required officers to respond using personal deliberation or exercise professional expertise, decision, or judgment. *See id.* at 397.

The City urges that uncontroverted summary-judgment evidence establishes that Garner was similarly performing "discretionary" functions in responding to events at the Lamar-Wallingford Bend intersection. In support of its motion, the City relied heavily on testimony from Garner and several other APD officers to the effect that Garner had been dispatched as the primary responding officer on a "Priority One" call indicating that a person was down, was not breathing or responding, and that the connection with the caller had been lost. A "Priority One" call, it was undisputed, signified to APD officers an emergency of the highest priority, such as where a person's safety is at risk from violence or a felony crime scene where an officer must apprehend a suspect or secure the scene. Garner added that, at least before he arrived at the scene, he could not rule out that he might encounter this type of situation. As it turned out, the subject of the call was an intoxicated homeless person who presented more benign issues,[5] but Garner insisted that he was unaware of that fact while responding to the call.

The City further emphasizes officers' testimony that under City of Austin policy at the time, the primary responding officer (as Garner was) on a Priority One call had discretion to choose between three different sets of procedures in driving to the scene: "Code 1," driving without

---

[5] However, in the aftermath of the collision, APD did arrest a responding tow-truck driver on outstanding warrants and for driving with an invalid license.

having emergency lights or siren activated; "Code 2," driving with only emergency lights activated; and "Code 3," driving with both emergency lights and siren activated. According to Garner, he opted to follow Code 1 procedures when driving south on Lamar because motorists, in his experience, tended to react chaotically and unpredictably in response to blaring sirens or flashing lights. Consequently, he reasoned, using Codes 2 or 3 would actually slow his travel as well as create public-safety risks. However, once he arrived at the turn lane and needed to traverse oncoming traffic, Garner claimed that he opted to go Code 2 and activated his emergency lights.

The City urges that this evidence conclusively establishes that Garner was continuously exercising "discretion" and "judgment" with respect to how he operated his vehicle in response to an "emergency." Albarran responds that fact issues exist with regard to whether the call to which Garner was responding was, in fact, a "Priority One" call, as Garner had claimed. She emphasizes a printout from APD computers reflecting that the call, at least as of the time it was "closed" a few minutes after Garner's arrival at the scene, had been designated a "Priority Two"—not a Priority One—with a "case type" of "ASSIS/EMS/NO/EMG." An APD officer who investigated the Garner-Albarran collision, Wallace Harmon, testified by deposition that "ASSIS/EMS" signified "assist EMS" and that it was "possible" that "NO/EMG" meant "no emergency." Harmon added that a Priority Two call might include such law enforcement functions as controlling traffic flows or securing a scene other than a scene of a murder or other violent crime. Harmon also acknowledged that information that the call was a "Priority Two" and had a "case type" of "ASSIS/EMS/NO/EMG," as reflected in the printout, would have been

9

displayed, in its original electronic form, on a computer in Garner's patrol car while he was in route to the scene.

The City downplays the significance of the printout and Harmon's testimony. It urges that this evidence does not controvert the testimony of Officer Garner and others that *at the time Garner was responding to the call*, the designation was Priority One. The City also relies on a "clarification" that Officer Harmon provided at a later juncture during his deposition. Following a recess of approximately twenty minutes, and before questioning resumed, the City's lawyer announced that Harmon wished to clarify his earlier testimony regarding the printout. Harmon then explained that the printout reflected "a final d[is]position" of the call and that it had been changed from what "originally came out as a Priority I man down call." Harmon added that officers were able to "change the title of calls" and that whichever officer had closed the call would have changed the priority level. He did not further elaborate on the factual basis for his conclusion that the information had been changed.

Albarran complains that Harmon's "clarification" had followed a lengthy recess and that it had obviously been prompted by consultation with the City's lawyer. Especially given these circumstances, Albarran adds, Harmon's "clarification" regarding the call's priority and designation should not be considered clear, positive, direct, otherwise credible, and free from contradictions and inconsistencies, as interested-witness testimony must be to support summary judgment. Tex. R. Civ. P. 166a(c).

Albarran also emphasizes the City's written policies regarding call response procedures. She observes that "Code 1" is subtitled or described as "Routine Operations," and that

the policy states, "[w]hen responding to a Code 1 call, officers may not violate any traffic law, nor may they use emergency lights or siren," although they may exceed the speed limit "in order to clock or catch up with vehicles that appear to be speeding, if they can do so in safety." "Code 2," on the other hand, is designated, "Limited Emergency Operation," and is said to be for use when responding to "urgent" calls, including: "1. Crash (Blocking); 2. Mischief/Vandalism in progress; 3. Suspicious Person or Vehicle; 4. Proceeding to a location in order to deploy TDDs [tire deflation devices]." As with Code 1, the policy requires that an officer operating Code 2 must obey all traffic laws. By contrast, the policy states that "Code 3 (Emergency Operation)" is used in such situations as "[s]erious injury collision" and "bomb threat" and that when operating Code 3, officers may exceed the speed limit, proceed through traffic signals after slowing or stopping, and disregard laws governing direction of movement and turning when it can be done safely. Only certain responders, including the "primary unit, the assigned backup(s), and a supervisor may operate Code 3."

It is undisputed that Garner never operated at Code 3. Albarran suggests that this fact, together with the text of the policies themselves and evidence about the printout, support reasonable inferences both that (1) the call to which Garner was responding was never a "Priority One" or "emergency" call, and (2) even if it were, whatever discretion Garner might have possessed in the manner in which he drove to the scene was constrained by his choice to follow Codes 1 and 2, under which City policy explicitly required him to obey all traffic laws. Further supporting these inferences, Albarran urges, is evidence that APD conducted an internal investigation of the collision and gave Garner a written reprimand, admonishing him that city employees are required to

11

operate vehicles "in a careful and prudent manner. They shall obey traffic laws and departmental policies/procedures."

On this summary-judgment record, we agree with Albarran that fact issues remain regarding, at a minimum, whether Garner's choice to respond to the call under Codes 1 and 2 rendered the manner of his driving to the scene ministerial, not discretionary. *See Gibbons*, 150 S.W.3d at 886; *Cordes*, 85 S.W.3d 342 at 345; *Daniels*, 66 S.W.3d 420 at 425. Consequently, the trial court did not err in denying the City's summary-judgment motion. Because this holding is dispositive of the City's appeal, we need not reach its contentions regarding good faith. *See* Tex. R. App. P. 47.1.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed:   June 23, 2011

12