TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-10-00328-CV






City of Austin, Texas, Appellant


v.


Librada Albarran, Appellee






FROM COUNTY COURT AT LAW NO. 2 OF TRAVIS COUNTY 

NO. C-1-CV-09-002929, HONORABLE ERIC SHEPPERD, JUDGE PRESIDING



 

M E M O R A N D U M O P I N I O N


 Librada Albarran sued the City of Austin (City) for money damages, alleging that it
was vicariously liable for negligence and negligence per se of Austin Police Department (APD)
Officer Scott Garner that had proximately caused an automobile accident resulting in personal injury
and property damage to her. (1) She relied on the waiver of the City's governmental immunity created
by section 101.021(1) of the tort claims act. See Tex. Civ. Prac. & Rem. Code Ann. § 101.021(1)
(West 2011). (2) The City asserted derivative immunity based on Officer Garner's official immunity;
i.e., that its governmental immunity was not waived by section 101.021(1) because Garner would
have been entitled to the affirmative defense of official immunity and, thus, "would not be personally
liable to the claimant according to Texas law." See id.; City of Lancaster v. Chambers, 883 S.W.2d
650, 658 (Tex. 1994). The City subsequently filed a traditional summary-judgment motion based
on this ground. Following a hearing, the trial court denied the City's motion. The City appeals that
order. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(8) (West 2008). Finding no error in the
trial court's denial of summary judgment on this record, we will affirm. 

 We review summary-judgment rulings de novo, taking as true all evidence favorable
to the nonmovant and indulging every reasonable inference and resolving any doubts in the
nonmovant's favor. Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005). A court
must grant summary judgment if the movant demonstrates that there is no genuine issue of material
fact and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). Where,
as here, a defendant moves for summary judgment based on an affirmative defense, the defendant-movant bears the burden of establishing each element of the affirmative defense as a matter of law.
Ryland Group v. Hood, 924 S.W.2d 120, 121 (Tex. 1996) (per curiam). 

 The affirmative defense of official immunity "is based on the necessity of
public officials to act in the public interest with confidence and without the hesitation that could arise
from having their judgment continually questioned by extended litigation." Ballantyne v. Champion
Builders, Inc., 144 S.W.3d 417, 424 (Tex. 2004). The underlying policy is that officials should be
afforded some leeway to err because "the risk of some error is preferable to intimidation from
action at all." Id. at 424 (citing Wood v. Strickland, 420 U.S. 308, 319-21 (1975)). To that end,
official immunity shields officials "from being forced to defend their decisions that were reasonable
when made, but upon which hindsight has cast a negative light." Telthorster v. Tennell, 92 S.W.3d
457, 461 (Tex. 2002). "Police officers' particular need for [official] immunity is well recognized:
'nowhere else in public service is official immunity more appropriate or necessary than in police
work. In their routine work, police officers must be free to make split-second judgments . . . based
on their experience and training, without fear of personal liability.'" Id. (quoting Travis v. City of
Mesquite, 830 S.W.2d 94, 103 (Tex. 1992) (Cornyn, J., concurring)).

 An officer's actions are shielded by official immunity when the following elements
are proven: (1) the officer was performing a "discretionary" function or duty, (2) within the scope
of his authority, (3) in "good faith." Ballantyne, 144 S.W.3d at 422; Telthorster, 92 S.W.3d at 461;
Chambers, 883 S.W.2d at 653. Consequently, to prevail on summary judgment based on Garner's
official immunity from liability arising from his collision with Albarran, the City had the burden to
conclusively establish that, with respect to Garner's actions from which his liability would arise:
(1) Garner was performing a "discretionary" function, (2) within the scope of his authority, (3) in
"good faith." See Telthorster, 92 S.W.3d at 461. 

 The basic circumstances leading up to the collision were undisputed. The collision
occurred on May 26, 2007, while Garner, driving an APD patrol car, was responding to a call
reporting a "person down" at a furniture store on the east side of the intersection of North Lamar
Boulevard and Wallingford Bend Drive in Austin. At this location, Lamar--one of the City's major
north-south arteries--has five lanes, with two northbound lanes, two southbound lanes, and a center
turn lane. The Lamar-Wallingford Bend intersection is not controlled by a traffic light, nor are there
stop signs on Lamar. To reach the scene, Garner drove south on Lamar without using his emergency
lights or siren. As he approached the intersection with Wallingford Bend, Garner pulled into the left
turn lane. Garner testified that he was aware that EMS had also been dispatched to the scene and
that, from his location in the turn lane, he could see an ambulance that had already arrived, as well
as a fire truck. The ambulance was parked on or along the northbound side of Lamar Boulevard,
facing north. (3) Garner testified that he had intended to turn across the northbound lanes of Lamar
and park behind the ambulance "to block and to prevent--a scene safety for them, if they had to load
or unload a patient, to protect the scene." However, there was heavy oncoming traffic in the
northbound lanes, including Albarran, who happened to be driving in the outermost northbound lane
and approaching the scene. Garner testified that he turned on his car's overhead lights (although
not his siren) to make the unprotected left turn across the oncoming traffic. While Albarran
acknowledged seeing Garner stopped in the center turn lane waiting to turn, she claimed she never
saw his emergency lights turned on.

 Garner testified that the traffic in the innermost northbound lane stopped to allow him
to turn, and he proceeded across that lane. He continued slowly into the outermost lane, Garner
claimed, when he perceived that the next approaching vehicle in that lane--Albarran's--dipped
forward, which indicated to him that she was braking to allow him to turn. On the other hand,
Albarran testified that she did not brake, but continued driving northward, slowly, as she observed
the ambulance and fire truck with their emergency lights on. She further claimed that she had
assumed Garner would wait for her to pass before turning, considering that she had not heard his
siren or seen his emergency lights activated, and that she had been surprised when Garner's car
suddenly collided with hers. Albarran asserts that Garner was negligent and negligent per se in,
among other things, failing to yield the right-of-way to her and not keeping a proper lookout. (4)

 Albarran has not questioned that the City established as a matter of law that Garner
had been acting within the scope of his authority. The parties have joined issue, rather, as to whether
the City met its burden to establish that Garner was performing a "discretionary" function and acting
in "good faith" when the collision occurred. We need only address the former element.

 "Discretionary" functions involve "personal deliberation, decision, and judgment,"
in contrast to "ministerial" acts, which "require obedience to orders or the performance of a duty to
which the actor has no choice." Chambers, 883 S.W.2d at 654; see Commissioner of the Gen. Land
Office v. Smith, 5 Tex. 471, 479 (1849) ("where the act to be done involves the exercise of discretion
or judgment in determining whether the duty exists, it is not to be deemed merely ministerial"). An
act is also said to be ministerial if "the law prescribes and defines the duty to be performed with such
precision and certainty as to leave nothing to the exercise of discretion or judgment." Chambers,
883 S.W.2d at 654 (quoting Rains v. Simpson, 50 Tex. 495, 501 (1878)). In determining whether
a government employee's action is "discretionary" versus "ministerial," the proper focus is "on
whether the officer is performing a discretionary function, not on whether the officer has discretion
to do an allegedly wrongful act while discharging that function." Id. at 653 (emphases added).

 The City concedes that "[t]he law is clear that simple non-emergency driving by a
police officer is a ministerial act" such that "an officer engaged in regular driving absent
special circumstances, who is involved in an accident, is not entitled to official immunity." See
Harris County v. Gibbons, 150 S.W.3d 877, 886 (Tex. App.--Houston [14th Dist.] 2004, no pet.)
(officer investigating possible stolen vehicle in non-emergency situation not shielded by
official immunity); Texas Dep't of Pub. Safety v. Cordes, 85 S.W.3d 342, 345 (Tex. App.--Austin
2002, no pet.) (officer "acting in the routine course of responding to an accident report" not shielded
by official immunity); Wichita Falls v. Norman, 963 S.W.2d 211, 216-17 (Tex. App.--Fort Worth
1998, pet. dism'd w.o.j.) (officer who caused collision while executing only patrol duties was not
shielded by official immunity); Woods v. Moody, 933 S.W.2d 306, 308 (Tex. App.--Houston
[14th Dist.] 1996, no writ) (official immunity did not shield officer who caused collision
while en route to "County business"). The basic rationale of these decisions is that under normal
circumstances, police officers, like other citizens, must obey traffic regulations when operating motor
vehicles and do not have discretion regarding whether or not to do so. City of Houston v. Daniels,
66 S.W.3d 420, 425 (Tex. App.--Houston [14th Dist.] 2001, no pet.); accord Gibbons, 150 S.W.3d
at 886; Norman, 963 S.W.2d at 215; Woods, 933 S.W.2d at 308.

 However, as the City emphasizes, Texas courts have recognized that a police officer's
operation of a motor vehicle may be deemed a discretionary function in certain situations. These
situations include an officer's deciding to undertake and conducting of a high-speed pursuit of a
suspect, see Chambers, 883 S.W.2d at 655, and an officer's decision to violate traffic laws in order
to quickly reach a scene of suspected criminal activity and assist another officer there, see Harless
v. Niles, 100 S.W.3d 390, 398 (Tex. App.--San Antonio 2002, no pet.). See also City of San Angelo
Fire Dep't v. Hudson, 179 S.W.3d 695, 704 (Tex. App.--Austin 2005, no pet.) (manner of
firefighters' driving in response to emergency call was discretionary function as matter of law);
City of Houston v. Flaniken, 108 S.W.3d 555, 557 (Tex. App.--Houston [14th Dist.] 2003, no pet.)
(manner of operating ambulance in response to emergency situation was discretionary function as
matter of law). Although these decisions sometimes speak in apparent circularities--e.g., a police
officer performs a "discretionary" function when responding to an "emergency" because responding
to an "emergency" entails discretion and judgment--their underlying principle seems to be that when
a police officer is performing certain law enforcement functions involving discretion and judgment
(e.g, pursuit and detention of suspects), it follows that this discretion and judgment can extend to
whether and how the officer utilizes a motor vehicle in performing these functions. See Chambers,
883 S.W.2d at 654; Harless, 100 S.W.3d at 397-98; see also Hudson, 179 S.W.3d at 704; Flaniken,
108 S.W.3d at 557. In Chambers, for example, an officer's high-speed pursuit of a suspect who ran
a red light was held to be a discretionary function because the officer had to elect whether to
undertake pursuit, and "[b]eyond the initial decision to engage in the chase, a high speed pursuit
involves the officer's discretion on a number of levels, including, which route should be followed,
at what speed, should back-up be called for, and how closely should the fleeing vehicle be pursued."
883 S.W.2d at 655. In Harless, officers proceeding to the scene of "suspicious activity" to assist
a fellow officer similarly had discretion to determine, in the first instance, whether to respond to
a report of ongoing criminal activity. 100 S.W.3d at 398. These circumstances required officers
to respond using personal deliberation or exercise professional expertise, decision, or judgment.
See id. at 397.

 The City urges that uncontroverted summary-judgment evidence establishes that
Garner was similarly performing "discretionary" functions in responding to events at the Lamar-Wallingford Bend intersection. In support of its motion, the City relied heavily on testimony from
Garner and several other APD officers to the effect that Garner had been dispatched as the primary
responding officer on a "Priority One" call indicating that a person was down, was not breathing
or responding, and that the connection with the caller had been lost. A "Priority One" call, it was
undisputed, signified to APD officers an emergency of the highest priority, such as where a person's
safety is at risk from violence or a felony crime scene where an officer must apprehend a suspect or
secure the scene. Garner added that, at least before he arrived at the scene, he could not rule out that
he might encounter this type of situation. As it turned out, the subject of the call was an intoxicated
homeless person who presented more benign issues, (5) but Garner insisted that he was unaware of that
fact while responding to the call. 

 The City further emphasizes officers' testimony that under City of Austin policy at
the time, the primary responding officer (as Garner was) on a Priority One call had discretion to
choose between three different sets of procedures in driving to the scene: "Code 1," driving without
having emergency lights or siren activated; "Code 2," driving with only emergency lights activated;
and "Code 3," driving with both emergency lights and siren activated. According to Garner, he
opted to follow Code 1 procedures when driving south on Lamar because motorists, in his
experience, tended to react chaotically and unpredictably in response to blaring sirens or flashing
lights. Consequently, he reasoned, using Codes 2 or 3 would actually slow his travel as well as
create public-safety risks. However, once he arrived at the turn lane and needed to traverse
oncoming traffic, Garner claimed that he opted to go Code 2 and activated his emergency lights.

 The City urges that this evidence conclusively establishes that Garner was
continuously exercising "discretion" and "judgment" with respect to how he operated his vehicle
in response to an "emergency." Albarran responds that fact issues exist with regard to whether the
call to which Garner was responding was, in fact, a "Priority One" call, as Garner had claimed. She
emphasizes a printout from APD computers reflecting that the call, at least as of the time it was
"closed" a few minutes after Garner's arrival at the scene, had been designated a "Priority
Two"--not a Priority One--with a "case type" of "ASSIS/EMS/NO/EMG." An APD officer
who investigated the Garner-Albarran collision, Wallace Harmon, testified by deposition that
"ASSIS/EMS" signified "assist EMS" and that it was "possible" that "NO/EMG" meant
"no emergency." Harmon added that a Priority Two call might include such law enforcement
functions as controlling traffic flows or securing a scene other than a scene of a murder or other
violent crime. Harmon also acknowledged that information that the call was a "Priority Two"
and had a "case type" of "ASSIS/EMS/NO/EMG," as reflected in the printout, would have been
displayed, in its original electronic form, on a computer in Garner's patrol car while he was in
route to the scene.

 The City downplays the significance of the printout and Harmon's testimony. It
urges that this evidence does not controvert the testimony of Officer Garner and others that at the
time Garner was responding to the call, the designation was Priority One. The City also relies on
a "clarification" that Officer Harmon provided at a later juncture during his deposition. Following
a recess of approximately twenty minutes, and before questioning resumed, the City's lawyer
announced that Harmon wished to clarify his earlier testimony regarding the printout. Harmon then
explained that the printout reflected "a final d[is]position" of the call and that it had been changed
from what "originally came out as a Priority I man down call." Harmon added that officers were able
to "change the title of calls" and that whichever officer had closed the call would have changed the
priority level. He did not further elaborate on the factual basis for his conclusion that the information
had been changed.

 Albarran complains that Harmon's "clarification" had followed a lengthy recess and
that it had obviously been prompted by consultation with the City's lawyer. Especially given these
circumstances, Albarran adds, Harmon's "clarification" regarding the call's priority and designation
should not be considered clear, positive, direct, otherwise credible, and free from contradictions
and inconsistencies, as interested-witness testimony must be to support summary judgment. Tex. R.
Civ. P. 166a(c).

 Albarran also emphasizes the City's written policies regarding call response
procedures. She observes that "Code 1" is subtitled or described as "Routine Operations," and that
the policy states, "[w]hen responding to a Code 1 call, officers may not violate any traffic law,
nor may they use emergency lights or siren," although they may exceed the speed limit "in order to
clock or catch up with vehicles that appear to be speeding, if they can do so in safety." "Code 2,"
on the other hand, is designated, "Limited Emergency Operation," and is said to be for use when
responding to "urgent" calls, including: "1. Crash (Blocking); 2. Mischief/Vandalism in progress;
3. Suspicious Person or Vehicle; 4. Proceeding to a location in order to deploy TDDs [tire deflation
devices]." As with Code 1, the policy requires that an officer operating Code 2 must obey all traffic
laws. By contrast, the policy states that "Code 3 (Emergency Operation)" is used in such situations
as "[s]erious injury collision" and "bomb threat" and that when operating Code 3, officers may
exceed the speed limit, proceed through traffic signals after slowing or stopping, and disregard laws
governing direction of movement and turning when it can be done safely. Only certain responders,
including the "primary unit, the assigned backup(s), and a supervisor may operate Code 3."

 It is undisputed that Garner never operated at Code 3. Albarran suggests that this fact,
together with the text of the policies themselves and evidence about the printout, support reasonable
inferences both that (1) the call to which Garner was responding was never a "Priority One" or
"emergency" call, and (2) even if it were, whatever discretion Garner might have possessed in
the manner in which he drove to the scene was constrained by his choice to follow Codes 1 and 2,
under which City policy explicitly required him to obey all traffic laws. Further supporting these
inferences, Albarran urges, is evidence that APD conducted an internal investigation of the collision
and gave Garner a written reprimand, admonishing him that city employees are required to
operate vehicles "in a careful and prudent manner. They shall obey traffic laws and departmental
policies/procedures."

 On this summary-judgment record, we agree with Albarran that fact issues remain
regarding, at a minimum, whether Garner's choice to respond to the call under Codes 1 and 2
rendered the manner of his driving to the scene ministerial, not discretionary. See Gibbons,
150 S.W.3d at 886; Cordes, 85 S.W.3d 342 at 345; Daniels, 66 S.W.3d 420 at 425. Consequently,
the trial court did not err in denying the City's summary-judgment motion. Because this holding is
dispositive of the City's appeal, we need not reach its contentions regarding good faith. See Tex. R.
App. P. 47.1.



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed: June 23, 2011

1. Albarran did not name Officer Garner individually as a defendant. 
2. Section 101.021(1) provides that "[a] governmental unit in the state is liable for:
(1) property damage, personal injury, and death proximately caused by the wrongful act or omission
or the negligence of an employee acting within his scope of employment if: (A) the property
damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or
motor-driven equipment; and (B) the employee would be personally liable to the claimant according
to Texas law." See Tex. Civ. Prac. & Rem. Code Ann. § 101.021(1) (West 2011); see also id.
§ 101.025 (West 2011) (waiving immunity from suit "to the extent of liability created by this
chapter").


 As there have been no material intervening substantive changes, we cite the current versions
of statutes for convenience. 
3. The parties disagree as to whether the ambulance was partially obstructing the outer
northbound lane of Lamar, as Garner claimed, or was pulled off the road, as Albarran maintained,
but this dispute is immaterial to our analysis.
4. See Tex. Transp. Code Ann. §§ 545.152 (operator turning left "shall yield the right-of-way
to a vehicle that is approaching from the opposite direction and that is in the intersection or in such
proximity to the intersection as to be an immediate hazard") (West 2011), 545.156 (requiring
operators to yield right-of-way and stop for emergency vehicles using audible and visual signals or
only audible signals) (West 2011).
5. However, in the aftermath of the collision, APD did arrest a responding tow-truck driver
on outstanding warrants and for driving with an invalid license.